## NATIONAL LABOR RELATIONS BOARD v. A. S. ABELL CO.

### No. 4329.

Circuit Court of Appeals, Fourth Circuit.

July 14, 1938.

Lawrence Hunt, Senior Litigation Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, Robert S. Erdahl, and Samuel Edes, Attys., National Labor Relations Board, all of Washington, D. C., on the brief) for petitioner.

W. Randall Compton and William D. Macmillan, both of Baltimore, Md. (Semmes, Bowen & Semmes, of Baltimore, Md., on the brief) for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

National Labor Relations Board, pursuant to the controlling statute, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., prays the enforcement of its order directed to The A. S. Abell Company, owner and publisher of two newspapers printed in Baltimore, Maryland, called The Sun and The Evening Sun. International Printing and Pressmen's Union, Baltimore Branch, Baltimore Web Pressmen's Union No. 31 had filed charges and the Board had found upon evidence presented to it that the publisher had engaged in unfair labor practices contrary to Sections 8(1) and 8(2) of the Act, 29 U.S.C.A. § 158(1, 2), by interfering with, restraining and coercing its employees in the exercise of their right to self organization guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157, in that the publisher had endeavored to dissuade them from joining the Union, and had interfered with the formation and administration of a Press Room Committee of its employees and had contributed to its support. The Board ordered the employer to cease and desist from such practices and to post in its press room notices to its employees stating that it would cease and desist as ordered. The Board, however, found that the publisher had not discouraged membership in the Union by discrimination in regard to hire or tenure or condition of employment contrary to Section 8(3) of the Act, 29 U.S.C.A. § 158(3), as charged by four of its employees.

Four questions have arisen upon the discussion in this court: (1) Has the Board jurisdiction over the business of the publisher as one which affects commerce among the several states within the meaning of the Act? (2) Did the employer engage in unfair labor practice by discouraging membership in the Union, or (3) by interfering with or encouraging the formation of the Press Room Committee? (4) Was that part of the order of the Board justified which required the employer to post in its press room notices to its employees stating that it would cease and desist in the manner aforesaid?

The stipulated facts with reference to the newspaper's business justify the findings of fact of the Board, which may be summarized as follows:

"The respondent, a Maryland corporation with its principal office and place of business at Baltimore, Maryland, owns, prints, and publishes The Sun, a daily morning paper with a Sunday edition called The Sunday Sun, and the Evening Sun, a weekday evening paper. * * * The paid circulation for August 1937 totaled 147,842 for

the morning papers, 151,067 for the evening papers and 208,978 for the Sunday papers."

"During the month of May 1937, the peak production month for the period from January to September, 1937, 9,643,300 papers consisting of 347,755,560 pages were printed in the respondent's plant at a total pay roll cost of $192,071.46 and by a total employment roll of 1,120 persons. This does not include colored portions of the Photogravure Section, the Comic Supplement, and the Magazine 'This Week', features of the Sunday edition, which are printed in New York State and shipped to Baltimore as railway baggage or freight, pursuant to purchase arrangements with the respondent."

"Seven and seventy-five hundredths per cent of the morning papers, 1.7 per cent of the evening papers, and 7.4 per cent of the Sunday papers are shipped to destinations outside the State."

"Widepread news-gathering, news-interchange, and news-distribution activities of the respondent, transcending the limits of the State of Maryland, are conducted through its branch offices in New York City, Washington, D. C., and London, England, through its correspondents in the principal foreign news centers, through its exclusive right in the United States to all the special correspondence and other material published in the Manchester Guardian of England, and through its direct wire, wirephoto, and teletypewriter arrangements with The Associated Press, the North American Newspaper Alliance, the New York Herald-Tribune, and Consolidated News Features, Inc. The respondent's membership in The Associated Press, a New York corporation engaged in the collection and interchange of information and intelligence for publication in newspapers in the United States and foreign countries, entitles that association to the exclusive use for publication of all local news and of certain types of news dispatches published in the respondent's papers. The respondent is also a member of the Newspaper Publisher's Association, a nation-wide organization."

"Advertising, representing a large variety of business interests, is solicited in a majority of the States for publication in the respondent's papers."

"The raw materials used in the publication of the respondent's papers, newsprint and news ink, are derived, predominantly, from sources outside the State;

all newsprint, from Canada and New York; 78½ per cent of the news ink, from the District of Columbia and Pennsylvania. Machinery, supplies, repair and replacement parts are purchased within and without the State."

We are of opinion upon these facts that the business of the respondent falls within the purview of the Act. It is true that the circulation which goes outside the State of Maryland is a relatively small part of the whole, but it nevertheless constitutes in itself a substantial volume of business. With this exception the news-distributing activities are of small extent. But the news-gathering activities are far flung, advertising is generally solicited throughout the nation by "National Advertising Representatives" (non-employees), and occasionally by employees, large portions of the Sunday edition are printed outside the State and shipped to Baltimore, and the raw materials used in all of the publications are derived for the most part from sources outside the State. It is clear that the instrumentalities of interstate commerce are used to a very large extent and are affected by the extensive and important business which the publisher conducts.

The collection and dissemination by the Associated Press of information for publication in newspapers in the United States and foreign countries, which was considered in Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, differs in the fact that the distribution of news in interstate commerce is as important a feature as its collection; but that case is not without its pertinence here, and see also Indiana Farmer's Guide Pub. Co. v. Prairie Pub. Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356. There are a number of other decisions sustaining the jurisdiction of the Board over business activities of no greater effect upon interstate commerce than those now under consideration. National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352; National Labor Relations Board v. Wallace Mfg. Co., Inc., 4 Cir., 95 F.2d 818; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138; Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 94 F.2d 61; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d

134, 112 A.L.R. 948; cf. Consolidated Edison Co. v. National Labor Relations Board, 2 Cir., 95 F.2d 390. In view of this course of decision it is not reasonable to conclude that the respondent's business is not covered by the Act on the ground that the greater part of its interstate operations involves the receipt rather than the distribution of information and materials in interstate commerce. The distinction, insofar as the effect upon interstate commerce is concerned, appears to be irrelevant. The respondent emphasizes passages in Schechter Poultry Corp. v. United States, 295 U.S. 495, 543, 55 S.Ct. 837, 848, 79 L.Ed. 1570, 97 A.L.R. 947, wherein it was found that the effect of the flow of commodities into a State was so remote as to be beyond the federal power; but we do not regard those expressions as controlling under the circumstances of the pending litigation notwithstanding the subsequent citation of the case in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 32, 36, 40, 41, 57 S.Ct. 615, 621, 623, 625, 626, 81 L.Ed. 893, 108 A.L.R. 1352, and Santa Cruz Fruit Packing Co. v. Labor Board, 58 S.Ct. 656, 660, 82 L.Ed. —.

In the last cited case the Supreme Court considered the business of a packing company engaged in preparing for shipment fruits and vegetables grown in California of which a substantial percentage was then shipped in interstate or foreign commerce. It was held that in view of the interstate commerce actually carried on by the packer, the contention that the business was not covered by the Act because the raw materials of production were not brought into the State from the outside was without merit. The court said (page 659):

"The existence of a continuous flow of interstate commerce through the state may indeed readily show the intimate relation of particular transactions to that commerce. Stafford v. Wallace, 258 U.S. 495, 516, 42 S.Ct. 397, 402, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 33, 43 S.Ct. 470, 476, 67 L.Ed. 839. But, as we said in the Jones & Laughlin Case, the instances in which the metaphor of a 'stream of commerce' has been used are but particular, and not exclusive, illustrations of the protective power which Congress may exercise. 'The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a "flow" of interstate or foreign commerce. Burdens and obstructions may be due to injurious actions springing from other sources.' National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, at page 36, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352."

The charge of interfering with, restraining and coercing the press room employees in regard to their right of self organization rests on evidence tending to show that between April and July, 1937 the Local Union, under the leadership of Louis Krampf, its president, carried on a campaign to organize the men during which Alfred C. Miller, the superintendent of the press room, made certain statements to dissuade them from joining the Union. A number of the men testified that Miller, in one form or another, told them that it would not be to their interest to join the Union or that it would be a detriment to them if they did so. The most definite statement, which was made on different occasions to six or seven men occupying the position of floormen, was that if the Union came in, they would be reduced to the position of paper handlers at $24 a week, a change which would have amounted to a demotion. In addition it was testified that Miller stated to one of the men that it would be foolish for him to join the Union; to another that he could not see in view of the conditions at the plant why any man should join the Union, and that a man so joining would get no consideration and would not be giving proper attention to the interests of his family; to another who admitted signing up with the Union, that the place would never change and that he had time to think it over; and to another employee that if he would stick by the company and not become a Union man, he would be given a better position. One of the employees was warned by Miller not to talk to the men about the Union on the premises. A few statements somewhat similar to those of the superintendent of the press room were attributed to the night foreman and they serve to corroborate the testimony as to Miller.

On his part Miller admitted that he had made inquiries of the men as to their interest in the Union because he desired to know what their attitude was; but he said that he had no recollection of making the statements attributed to him which

were seemingly intended to discourage Union membership. It was shown by witnesses for the Union that on more than one occasion Miller told employees that all would be treated alike, whether they were Union members or not; and the Board failed to find, notwithstanding certain complaints, that any actual discrimination against employees because of Union sympathies had occurred. There was no evidence that any employee of the press room was actually coerced or restrained from joining the Union or from remaining a Union member when once he had joined. Indeed all the witnesses who testified for the Union joined the body either before or after Miller's statements were made, and retained their membership at the time of the hearing before the Board.

According to a circular distributed by the Union, William F. Schmick, executive vice president and business manager of the establishment, stated at the beginning of the Union campaign that he had no objection to the press room employees joining the Union, and there was no evidence that Miller's attitude with regard to the Union was assumed at the behest of his superior officers. His testimony was to the contrary. The newspaper maintained an open shop. Two other departments of the business, the stereotype and the typographical, had previously been unionized and negotiations between the Union and the publisher had been continuously carried on.

It is obvious from this recital that even if all the testimony unfavorable to the employer be accepted at its face' value, the offenses proved were not of grave importance. Nevertheless there was substantial evidence to show that the superintendent of the press room, who had control of the men in that department with authority to hire and discharge them, made a number of statements from which the men might fairly infer that it was not to their interest to become members of the Union and that they might suffer from such an association. We conclude, therefore, that there was basis for the order of the Board insofar as it directed the employer to cease and desist from interfering with its press room employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C.A. § 157, and from discouraging membership in the Union. The doctrine of respondeat superior applies and the management must assume responsibility for the actions of its supervisory official even though it had no actual participation therein.

We find, however, no substantial ground for the conclusion of the Board that the employer sponsored and encouraged the establishment of the Press Room Committee. The evidence is definite that the idea was conceived by one LeFaivre, a pressman of some ten years' experience, one of the younger employees, who, being unfavorable to the Union himself, reached the conclusion that his fellow workmen, especially his associates on the night force, were disturbed by the efforts of the Union to organize the press room. With the aid of a law student he prepared a petition to be circulated amongst the men. In substance it stated that the signers were entirely satisfied with their working conditions; that whenever necessary they would form a committee to represent the press room in matters pertaining to the welfare of the men and of the publisher and pertaining to salaries or working conditions; that they would abide by the ruling of the committee, and did not wish to join any union or other association; and they requested their employer to recognize no other committee. According to the direct testimony, neither Miller, the superintendent of the press room, nor the foreman, nor any official of the company had any share in the circulation of the petition or formation of the committee.

LeFaivre circulated the petition among the night men and three other pressmen, Groves, Johancen and I. O'Connor, circulated it among the day men, and it was signed by 72 out of the 87 press room employees. An engagement was then made through Miller and the petition was presented to Schmick on June 4, 1937 by a group of men which included LeFaivre, House, Krausch and Snyder. Schmick received the petition, thanked the men and dismissed them.

After leaving Schmick, it was decided to call a meeting of the signers at Krausch's home on the following Sunday afternoon. The men were notified and 30 to 47 attended, according to varying estimates. At this meeting Groves and Johancen were nominated as officers but Barnes and Berry, both of whom were members of the Union, were chosen. No explanation of the election of union men by employees supposedly hostile to the Union is vouchsafed. A committee of seven was also

chosen to confer with the management as occasion might arise. After the business meeting was concluded, beer was served which had been purchased out of a common fund and the men took part in a card game. This entertainment was shared by Miller and O'Connor, the day foreman, who arrived after the business meeting had been adjourned. No subsequent meetings of the organization were held and the committee chosen to represent the men made no subsequent attempt to confer with the management.

The Board in its opinion refers to certain attendant circumstances as indicating that the formation of the committee was inspired by the management in order to impede the efforts of the Union organizers. Reference is made to evidence showing that a month before the petition was prepared, LeFaivre happened to be in Miller's home when the president and vice-president of the local Union called, and tried unsuccessfully to persuade Miller to join the Union, and that Miller then told the Union men that 80% of the press room employees were pledged to him, a percentage close to that of the signers of the petition which was subsequently circulated; that Miller told one of the signers that by signing he had done the right thing; that some of the signers affixed their names on the desk in Miller's office during his absence; that two of the press men, Grove and Johancen, who circulated the petition amongst the day force, sometimes acted like assistant foremen and gave orders to other workmen in the press room, although it was proved that the two received the same salary as other press men and had no greater privileges or authority than they to discipline the men; that a third man who circulated the petition amongst the day force was a son of the day foreman and that LeFaivre was the son-in-law of the foreman of the composing room, although the Board made no mention of the fact that LeFaivre's father-in-law was a strong Union man; that Grove acted as day foreman when the regular foreman went on vacation and that one of the men who waited on Schmick with the petition after it was signed acted as foreman one night a week in the absence of the regular foreman; and that Miller and O'Connor attended the party of the press room employees which followed the organization of the committee although it was the custom of these supervisory officials to attend social gatherings of the men. Comment is made upon the fact that the business manager receiving the petition which expressed entire satisfaction with the working conditions in the plant, thanked the men with the statement that "it was nice to get the petition and it showed a spirit of loyalty"; and it is emphasized as indicating a lack of bona fides in the organization that it had no constitution or by-laws, held no subsequent meetings, made no attempt to bargain collectively and presented no grievances to the management, and that LeFaivre in considering the question of incorporation, thought of the petition as a scrap of paper.

If one finds it incredible at the outset that a majority of the pressmen were not only opposed to the Union but were satisfied with prevailing working conditions, it is possible to conjecture from the attendant circumstances that the employer was pleased with the situation or even that it encouraged the formation of the press room committee. There is, however, no justification for the position that spontaneous action on the part of the men is so improbable as to warrant the inference that it was inspired by the management. The promotion of the Union originated outside the shop and did not spring from the dissatisfaction of the men with their wages and working conditions; and the formation of the committee designed to represent the men in place of the Union and its failure to present any grievances in the short interval between its formation in June and the hearing before the trial examiner in September, 1937 tend to prove that there were no grievances to present, rather than that the committee was a sham imposed by the management upon the men. The choice between Union and Committee was presented to the men; its free exercise was guaranteed in the "right to self-organization" and "to bargain collectively through representatives of their own choosing", conferred by Section 7 of the Act, 29 U.S.C.A. § 157; and there is no sufficient evidence in this case of interference or domination on the part of the employer. In this respect the burden of proof was upon the Union, and while the charge was supported only by conjecture and suspicion, it was refuted by positive and direct testimony. The failure of the Board to credit this testimony does not supply the lack of affirmative proof of unfair labor practice on the part of the employer.

In Appalachian Electric Power Co. v. National Labor Relations Board, 93 F. 2d 985, 989, this court said:

"We are bound by the Board's findings of fact as to matters within its jurisdiction, where the findings are supported by substantial evidence; but we are not bound by findings which are not so supported. 29 U.S.C.A. § 160(e) (f); Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 650, 81 L.Ed. 965. The rule as to substantiality is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict. In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences. Cf. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339-343, 53 S.Ct. 391, 393, 394, 77 L.Ed. 819."

In Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 343, 53 S.Ct. 391, 395, 77 L.Ed. 819, the court, speaking of the function of the trial court in withdrawing a case from the jury, said:

"And where the evidence is 'so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury.' Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Patton v. Texas & Pacific R. Co., 179 U.S. 658, 660, 21 S.Ct. 275, 45 L.Ed. 361. The rule is settled for the federal courts, and for many of the state courts, that whenever in the trial of a civil case the evidence is clearly such that if a verdict were rendered for one of the parties the other would be entitled to a new trial, it is the duty of the judge to direct the jury to find according to the views of the court. Such a practice, this court has said, not only saves time and expense, but 'gives scientific certainty to the law in its application to the facts and promotes the ends of justice.' Bowditch v. Boston, 101 U.S. 16, 18, 25 L.Ed. 980; Barrett v. Virginian R. Co., 250 U.S. 473, 476, 39 S.Ct. 540, 63 L.Ed. 1092; and cases cited; Herbert v. Butler, 97 U.S. 319, 320, 24 L.Ed. 958. The scintilla rule has been definitely and repeatedly rejected so far as the federal courts are concerned. Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L.Ed. 867; Commissioners of Marion County v. Clark, 94 U.S. 278, 284, 24 L.Ed. 59; Small Co. v. Lamborn & Co., 267 U.S. 248, 254, 45 S.Ct. 300, 303, 69 L.Ed. 597; Gunning v. Cooley, supra; Ewing v. Goode [C.C.], 78 F. [442], 443, 444."

We conclude, therefore, that the order of the Board should be modified by the omission of the direction to the employer to "cease and desist from recognizing the pressroom committee as a bargaining agency for its employees and in any manner interfering with the formation or administration of, or contributing support to, the pressroom committee, or any other labor organization of its employees." The factual basis for such a direction, as we have seen, does not exist; and since it appears that the formation of the committee was the free and untrammelled action of the employees themselves, denial of recognition to the committee would deprive them of the most important rights accorded them by the statute, the right to self organization and the right to bargain collectively through representatives of their own choosing.

We are of opinion also that the form of the notice of the Board's decision which it ordered to be posted in the press room of the employer should be modified. The Board ordered the employer to cease and desist from interfering with, restraining or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act, and specifically to cease and desist from discouraging membership in the Union and from recognizing the Press Room Committee as a bargaining agency, and from interfering with its administration or contributing to its support; and the Board, as is its custom, also directed the employer to "take the following affirmative action which the Board finds will effectuate the policies of the Act; (a) Post immediately in conspicuous places in its press room notices to its employees stating that the respondent will cease and desist in the manner aforesaid."

It is pointed out that the statement of the employer that it will cease and desist from the prohibited actions necessarily implies that it has been guilty in the past of the unfair practices charged; and it is contended that neither court nor ad-

ministrative tribunal should compel a person against his will to admit an infraction of the law, even if he has been convicted thereof by duly constituted authority. We are in accord with this view. The responsibility of enforcing an order of the Board is imposed upon this court, and if necessary, compliance may be compelled by attachment for contempt. We think that the power to compel a person to confess the commission of an illegal act, if such power exists, should not be exercised in Labor Board cases; and that a refusal to confess, when ordered by the Board to do so, should not be punished under the power of the court to enforce obedience to its decrees. The requirement that notice of the decision and order of the court should be published whereby employees may receive precise information of the action of the Board upon a complaint against their employer is within the power of the Board to direct such affirmative action on the part of the employer as will effectuate the policies of the Act; and such a requirement has been generally approved in a number of cases, but the precise point now under consideration has not been discussed. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. ——; National Labor Relations Board v. Pacific Greyhounds, Inc., 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. ——; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, certiorari denied 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. ——; National Labor Relations Board v. Wallace Mfg. Co., Inc., 4 Cir., 95 F.2d 818; National Labor Relations Board v. J. Freezer & Sons, 4 Cir., 95 F.2d 840; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138 and National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193. The purposes of the Act will be fully met in this respect if the employer is required to post in a conspicuous place a notice to its employees which contains a copy of the order of the Board, with its enumeration of the actions from which the employer has been ordered to cease and desist, and of the affirmative actions which it is required to take, including, in the latter, a posting of a copy of the order of the Board, together with a statement that the order has been approved by this court and is binding upon the employer.

A decree of this court will be signed modifying the order of the Board, as indicated herein, and directing that the order as modified be enforced.