## HUMBLE OIL & REFINING CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 9323.

Circuit Court of Appeals, Fifth Circuit.

June 24, 1940.

Winfred J. Barnes, J. Q. Weatherly, Hines H. Baker, and E. E. Townes, all of Houston, Tex., for petitioner.

Charles Fahy, Gen. Counsel, National Labor Relations Board, and Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and Warren Woods, Regional Atty., National Labor Relations Board, of Atlanta, Ga., for respondent.

John H. Crooker, Carl G. Stearns, and W. A. Combs, all of Houston, Tex., for interveners.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

This case arises under Section 10(e) and (f) of the National Labor Relations Act, 29 U.S.C.A. § 160(e, f), on petitions by the Humble Oil & Refining Company, which we will call Humble, and by Employees Federation of the Humble Oil & Refining Company, Baytown Refinery, and Employees Federation of the Humble Oil & Refining Company Ingleside Refinery, which we will call the Federations, to set aside in whole or in part an order of the Labor Relations Board issued October 18, 1939. The order in substance is that Humble cease and desist from dominating or interfering with the Federations and from contributing support thereto; and from interfering with, restraining or coercing its employees in the exercise of their right to seek organization as guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157; and from giving effect to the contracts made with the respective Federations on August 12 and 18, 1937; and as affirmative action that Humble withdraw all recognition of the Federations and post notices accordingly. The Board in its answer asks enforcement.

The charges were preferred by Oil Workers International Union, Locals No. 333 and No. 316, affiliated with the Committee for Industrial Organization, which had respectively been established at the Baytown and Ingleside Refineries since sometime in 1935. Humble contends that since 1920 it has consistently followed a policy of non-discrimination as respects union affiliations, and seeks to defend its good name against unjust conviction of any unfair labor practice. The Federations, which are unaffiliated with any national organization, were served with notice by the Board, were allowed to answer the complaint, employed their own counsel, and very actively defended themselves before the Examiner and the Board, as they have before this court. They contend that the Board was not authorized under the law and the evidence to put the Federations to death over their protest in view of the fact abundantly proved that from the organization of each Federation to the date of the order a large majority of the 3,600 employees at the Baytown Refinery and of the 670 employees at Ingleside Refinery have been members thereof, and about two-thirds of each group have voted for the Federations as their bargaining representatives.

■ Since 1920 at Baytown, and at Ingleside since the establishment of the refinery there, all the non-supervisory employees have been treated as the bargaining unit. No one suggests that the unit ought to be otherwise. Under Section 7 of the Act the employees have "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing." By Section 9(a) "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer." Subsection 9(b) gives the Board the right to fix the unit in each case, but as stated there is here no dispute about the proper units. 29 U.S. C.A. § 159(a, b). The Board has expressly found that each of the four contestants is a labor organization, and that each admits to its membership the same classes of employees. So long as a majority of the employees in each plant freely choose to belong to or be represented by the Federations they are the bargaining representatives and the contracts they make cannot be ignored. Minority groups may separately present their grievances, but must submit to bargain through the majority representatives. The Board is without power to order otherwise.

■ But the choice of the majority must be a free choice as respects the employer. Section 8, 29 U.S.C.A. § 158, states things he may not do, and Section 10 gives the Board power to order him to cease and desist. Among other things, the employer may not "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157]." He may not "dominate or interfere with the formation or administration of any labor

organization or contribute financial or other support to it." The first-quoted words refer especially to individual employees, though they may apply also to organizations. The last-quoted words refer only to labor organizations and are the presently important ones. "Dominate" is a strong word, meaning to master, to rule, to control. "Interfere with" is a weaker and more extensive term, and may include any substantial intermeddling. It is fairly intended that an employer shall take no part in the original formation of a labor organization, or in the subsequent administration of its affairs, either by opposition or by any kind of support. If he does, a cease-and-desist order may be issued, and in some cases the Board may, as has been held, disestablish the organization. The Board cannot, however, prevent the same employees, acting freely and of their own choice, from immediately again organizing themselves, and establishing if they wish the same constitution, and selecting the same persons to lead them. This is so because the Board is not made either guardian or ruler over the employees, but is only empowered to deliver them from restraint at the hands of the employer when it exists. If employer interference has been slight, and not coercive or oppressive, suppression of a majority organization whose members are not complaining of interference would be an extreme step. If the Board should order it under Section 10(c) as "affirmative action which will effectuate the policies of this Act", it may be a question whether the court should hold such action not calculated to effectuate the act's true policies. In the present case, however, the contention of the Federations is simply that Humble did not dominate or interfere with their formation, nor subsequently with their administration.

The two complaints, consolidated for trial, each charged that Humble on or about April 23, 1937, in the case of Baytown, and April 30, 1937, in the case of Ingleside, had dominated and interfered with the formation, enlistment of members, and the administration of each Federation, and did contribute support by encouraging solicitation of members by foremen, by allowing meetings on company time, by discouraging membership in the Union, and by permitting solicitation of membership on company property and time; and that these things still continued, and were unfair labor practices under Section 8(1) and (2). The issues were joined on these charges.

It is proved without controversy that for many years prior to 1937 the employees at each refinery had been organized for bargaining under a written plan called the Joint Conference Agreement proposed originally by Humble, under which the employees at each refinery annually elected their own representatives in groups designated by the plant superintendents, and these representatives met monthly with representatives of the management to bargain or adjust grievances; they had made many agreements, and had adjusted all grievances without any threat of a strike; but in September, 1936, the Union at Baytown, though having a membership never more than one-fourth of the employees, insisted on being recognized as the bargaining agent and asked wage raises, and on refusal threatened a strike. There was great local excitement, and serious prospect of violence between the would-be strikers and those who wished to work. A letter to the employees about the situation was written on September 3, 1936, by Weiss, the executive vice-president of Humble, stating the company's policy and suggesting outside influences behind the strike, and promising an open shop. Another letter was later written by Weiss to the Commissioner of Conciliation who was handling the matter, stating that Humble's established policy was that no employee should be discriminated against because of Union membership, that if the strike was called off no member would be discharged because of his membership or his voting to strike, and that Humble would gladly forget the unhappy incident. The strike was called off September 17. In February of 1937 the Unions began intensive membership drives in both refineries. The opposition organized what was called the Security League which distributed anti-union literature. The editor of the Humble Bee, a publication supported by Humble, wrote articles which praised the existing set-up. On April 12, 1937, the Supreme Court decided the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, which established the jurisdiction of the Board over manufacturing plants whose raw materials or finished products move in interstate commerce. This court had decided to the contrary a year before, following the decision in Carter v. Carter

Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L. Ed. 1160. Nobody involved here had theretofore supposed the National Labor Relations Act applied to these refineries, or had appealed to the Board. Humble at once concluded that the act did apply, and that the Joint Conference Agreement must be set aside, since the employer had formed it and bore the expense of its operation. The directors themselves commissioned one of their number, Baker, to announce to the several groups of employees at Baytown and Ingleside the abrogation of that agreement and the application of the act, and authorized a written statement to be read. The statement was read at Baytown April 23, and at Ingleside April 30, 1937. The organization of the Federations occurred in the next few days.

Very clearly the complaints in this case relate only to occurrences touching the organization and administration of the two Federations which took their rise on and after April 23 and April 30, 1937. Under the rules of the Board and under general principles of fairness other unfair labor practices were not for trial. The Examiner frequently so ruled, and excluded much evidence about the strike and the alleged threats and coercion of the Unions, and the resentment about them in the minds of the other employees. But he admitted the Weiss letter of September 3, 1936, and the conduct of Humble generally during the seven months prior to April 23, 1937, to throw light on the charges in the complaints. It is of course true that life, whether of individuals or groups, is continuous, and occurrences of the present have their roots in the past. To understand what was said and done on and after April 23, what happened before may be looked to. But often it appears that at some particular time a clear turning point is reached at which the past is past, and illustrates the present only by contrast. April 23 was such a turning point. What happened before it became known that the National Labor Relations Act applied at these refineries could of course be examined to see if a real or only a pretended turning point was then reached. But if part of the prior story was admitted, all of it should have been. The excluded evidence tended to show that the strike was called at a Union meeting attended by not over 150 employees, that the great majority of employees wished to work, that the

Union threatened that the plant would be closed down anyhow, that pickets to prevent others from working would be imported from the Longshoremen's Union at Houston and that a burly sample of them was brought to Baytown; that bodily violence and ultimate loss of their jobs was threatened to opposers, and one man was beaten up; that the non-union employees resented the conduct of the Union, and wished no connection with it. Weiss' letter of September 3, written in connection with such circumstances, is to be viewed in the light thereof. We do not think that the law, any more than common sense, would require the employer to stand as a sheep before his shearers dumb, not opening his mouth. The right of free speech touching his own interests was involved. But it is unnecessary to examine into the merits of the strike or the alleged coercion of the Union, or the propriety of the Weiss letter because, with the rejected evidence in or out, we find nothing to justify a belief that on the part of the responsible representatives of Humble the turning point on April 23 was not real. Their disestablishment of the Joint Conference was total and final. Notice thereof was posted in all bulletin boards, and copies of Baker's statement and of the proceedings at its reading at Baytown and at Ingleside were published and circulated among the men. Both the statement, and the oral discussions with Baker, who as a director and the representative of the directors was the highest authority in Humble's organization, made it entirely plain that the field was clear for the men to do what they pleased, and that the company would not take, or permit any of its representatives to take, any hand in any employee organization. What was done was exactly what the Board would have ordered done if it had then found the Joint Conference Agreement a violation of the Act. It was the full equivalent of what was done in the case of Magnolia Petroleum Co. v. National Labor Relations Board, 5 Cir., 112 Fed. 545. We find nothing to impugn the good faith and finality of Humble's action. It was at once followed by a circular communicated to every supervisory employee stating the company's position and prohibiting interference by them in the company's behalf. A personnel man, Wilkie, who on April 30, just before the meeting at Ingleside, had distributed eight or nine copies of a mag-

azine article adverse to C. I. O. was disciplined for it and removed from his job at Ingleside.

■ In the Board's fact findings twenty-four pages relate to what happened before the disestablishment of the Joint Conference Agreement. It found, as everyone conceded, that the Agreement was contrary to the act. It found that at Baytown what may be referred to as the Weiss letter, the Brown incident, the Kelly statement, and the Reilly statement, and the operations of the Security League were each an unfair labor practice chargeable to Humble; and in like manner at Ingleside the Ready incident, the Curtin conversation with Ingram, and of Farned with Wier and of Goss with Wier, and Wilkie's magazine distribution were each formally and separately adjudged unfair labor practices. None of these eleven convictions were authorized by the complaint because not charged in it. They therefore do not support the Board's order touching violations of Section 8(1); and they have no evidentiary value with reference to the formation and administration of the Federations because when they happened the Federations were not even thought of, it was not known the act applied, and they are isolated by the public occurrences of April 23 and April 30, 1937.

■ The Board separately finds the facts at Baytown and Ingleside on and after those dates, and they control the case. They begin with the Baker statement and the oral questions and answers which followed its reading, all stenographically reported, bulletined and circulated as above stated. We do not find in these any undue praise of the old plan nor any covert promise to help an inside organization more then an outside one. The statement reads to us as an honest announcement of the company's reasons why the old plan was discontinued, and of what the act, which had just been held to apply, provided. It stated: "The Act does not compel any employee to join a union or any other labor organization but leaves the employee entirely free to join or not join. The employees may bargain with the Company in such manner as they themselves shall determine upon through such representatives as they may choose, free from domination, interference, coercion or restraint on the part of the Company. * * * The method of collective bargaining to be used and established by the employees is for them to

determine." At Ingleside a member of the Union present asked many questions, whether the company had any plan to propose, and whether the plan already under consideration at Baytown was to be adopted. Baker replied to the first question: "As far as the Company is concerned I would like to make it perfectly clear it has no proposals as to what form of bargaining agency the employees may select." To the second he replied: "The Company is not recommending to Baytown or to any other group of employees what method they shall employ. * * * It is entirely in the hands of the employees themselves." Replying to other questions Baker stated: "The Company is not going to undertake to influence or encourage any form of organization through its supervisors or foremen. Nobody is speaking for the management on this subject. Anybody undertaking to speak on this matter to encourage or discourage will not be speaking for the Company * * *. The Company will not try to form any organization and will instruct all its men in management positions that they cannot speak for the Company for or against any labor organization." It was stated there would never be, as there had never been, any discrimination because of union membership. Wilkie's act of that morning in distributing the magazine article was brought up and publicly disowned. We see no reason to doubt that at both plants the company's indifference, the freedom of the men to act as they chose, and the commands laid on the supervisors were thoroughly understood.

The Unions had been in the field over a year, the subject of much controversy. The evidence submitted leaves no doubt (though the Examiner ruled out much) that there was strong opposition to them among the men. Immediately after the April 23 meeting this opposition at Baytown got busy preparing a constitution for an independent organization. They worked in two rival groups at first, but later joined forces. They used as a basis the old Joint Conference Agreement and constitutions of three other labor organizations which they themselves procured. No company supervisor or foreman had any hand or voice in it. At their own expense they printed the result, and a letter of presentation, and a form of ballot which provided for joining the proposed Federation if desired, and for voting for or against it. The election was held

outside the company premises through several days, ending May 4. Of the 3,600 employees eligible, 2,516 voted for the Federation and 79 against it. The application for membership was signed by 2,038. The Board mentions that a "gang-pusher ordered a group of Mexicans and negroes to vote." The evidence shows that such a group of five or six was asked by their foreman if they had voted, they said no, and he said: "Come up here and vote, this is to take the place of the Joint Conference." They voted. The record does not show how they voted. The "gang-pusher" was himself a voting employee. We see no reason why he might not ask his men to vote. If their five or six votes were invalid it did not affect the result of the election. The members soon organized by electing permanent officers and committees, which offered to bargain with Humble, asserting their representation of a majority of all employees. Bargaining was carried on over several days, the witnesses stating that the argument was frequently heated and determined. An agreement was reached finally, and the contract was submitted by the Federation to a vote of all members according to their constitution. The company required a sworn return of the original election showing that the Federation really represented a majority of the employees, and both sides signed the agreement on August 14th.

At Ingleside, aware of what was occurring at Baytown, before the meeting on April 30 employees who were opposed to the Union had gotten copies of the constitution, letter and ballot proposed to be used at Baytown. These were under discussion just before the Ingleside meeting of April 30 opened, and were mentioned in the meeting as above stated. Proceeding as Baytown had done, there was an election at Ingleside May 6 to 8, the Federation obtaining a majority. Organization was perfected, and a committee sought to draft a contract to present to the company. They did not get along well and went to Baytown and got a copy of the contract under negotiation there. With slight changes it was adopted in an election by the Ingleside members and executed by the company and that Federation on August 18.

Every person who was active in preparing the constitution and ballots and letters, to the number of about sixty at Baytown and sixteen at Ingleside, testified or it was stipulated that they would testify, that no

representative of the company, not even a foreman, had in any manner had anything to do, even by suggestion, with either organization, or had contributed in any manner to its expense, but that the organization was the work of employees and represented what they wanted. No one testified anything to the contrary. A number of other witnesses testified they joined because they wished to and without any suggestion from Humble. No one testified that he joined because of any interference by Humble or anyone acting for it. If human testimony can establish anything it establishes that Humble did not dominate or interfere with the organization of either Federation.

Has Humble interfered with their administration since, so as to destroy their right to function? The Board finds that after the election in May at Baytown a superintendent Holland in a casual talk with Fogarty, a Union man, expressed sentiments intended to discourage Fogarty's Union affiliation. At about the same time Walmsley, a superintendent, told a Union man Wright that his Union activities interfered with his promotion as he did not get along well with his fellow workers. Two months later Massey, a supervisor, told Doleshol, a Union man, he should sign up with the Federation because of the position he was in. Later in the fall one Sheffers, a supervisor, ridiculed a Union button and spoke favorably of the Federation. The Board found all these to be the acts of the company, and that they interfered with, restrained and coerced the named employees in the exercise of their rights under Section 7.

At Ingleside the Board finds that about a week after the Federation election the Union held a meeting, and that one Ready, hired as a special policeman by Humble, was seen taking note of the license numbers of the cars there. We have found no evidence that Ready had any duties of that sort or was on duty at the time and place, but the Board assumes he did it for the company, and that the surveillance coerced the Union men. About the same date Waddell, a safety supervisor, talked with Kirkpatrick to the effect that joining the Federation would contribute to his promotion. Also a little later Curtin, an assistant superintendent, talked with Ingram, a Union man, and suggested his swinging into the Federation and made a like suggestion to Tarver; and one Talk, of the personnel department, sought to get one

Colton to join the Federation. These were all held interferences with and coercions of the men spoken to.

 With two exceptions all these incidents were denied. The Board had the right to believe the Union men, and we of course accept their finding that these things happened. We will not discuss whether in each instance the person charged could act or speak for Humble, for in some cases his rank was such that he could, and he appeared to be speaking in the exercise of his authority, although, as we have seen, strict orders had been given against doing so. Such incidents serve to support the Board's order that Humble cease and desist from interfering with or coercing its employees in respect of their rights under Section 7, though it does not appear that anyone's affiliation was changed thereby; for each employee has the right to be let alone in this respect by the company and its representatives. As to mere foremen, who were themselves eligible to membership in the employee organizations, we adhere to what was said in National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474. When not speaking in the exercise of their authority, nor with the knowledge or approval of the employer, but in discussion of employee affairs on their own responsibility, they are within their personal rights of free speech. The constitutional right of free speech extends to industrial matters. Thornhill v. Alabama, ⌐ S.Ct. 736. 84 L.Ed. 1093. The National Labor Relations Act does not undertake to restrain it except to forbid employers, including persons acting in their interest, Section 2(2), 29 U.S.C.A. § 152(2), to try to control what does not concern them.

 But these incidents do not support the charge of dominating or interfering with the administration of the Federations. Each Federation had already been formed, and its majority status fixed by the elections. Unsuccessful meddling with union men had no deterrent effect on the administration of either Federation. It would be strange indeed if a labor organization, freely organized by a large majority of the employees, is to be destroyed whenever some well-wishing supervisor, contrary to his own duty and orders, says something in its favor. As we see it, the employees who freely formed these organizations have the right under the law to have them function. If the employer trespasses through

his representatives, he and they ought to be stopped, but a more serious and demoralizing trespass than here appears is necessary to show such domination or interference or support as will justify annihilation of such organizations.

The Board lays some stress on the fact that Thomas, who first set to work on the Baytown constitution, had been a secretary of the employees' representatives under the Joint Conference plan and had been a leader in the Security League drive against the union. He was a man of college education and well qualified to lead. He was an employee without any supervisory authority. We see nothing either in his familiarity with the old plan or in his pronounced opposition to the union which would disqualify him to lead' in the new organization. As to Waddell at Ingleside, he was a safety man whose duty it was to instruct men about safety. He could not hire or discharge anyone or give anyone any orders. He was eligible to membership in the Federation. If he took an early interest in it and showed copies of the Baytown constitution and ballot to interested persons at Ingleside on the morning of April 30, this does not establish such domination and interference by Humble with the subsequently formed Federation at Ingleside as would condemn it. The evidence however is only that he showed to some fellow-members of the Joint Conference then about to meet the minutes of what happened at Baytown, and said: "That is about what you can expect at our conference today."

The Board also finds too much similarity in the Federations' constitutions and contracts to the old Joint Conference Agreement to satisfy it of independence. The evidence is undisputed that the old set-up was considered, and in part adopted, though with considerable changes. The employees wanted what they took from it and it was their right to take it. An unfounded suspicion that these men acted on a supposed intimation from Humble will not do. Texans have never been remarkable for timorousness. This record shows none of it on either side of the union dispute in this plant. It cannot be assumed against the sworn testimony of those involved in the assumption.

Our conclusion that the Federations may not be disestablished is supported by the recent cases L. Grieff & Bro. v. National Labor Relations Board, 4 Cir., 108 F.2d 551; National Labor Relations Board v.

Swank Products Co., 3 Cir., 108 F.2d 872; and Magnolia Petroleum Co. v. National Labor Relations Board, 5 Cir., 112 F.2d 545. National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219, is easily distinguishable.

The Union complained additionally of three discharges of its members as discriminations because of union activity. The Board dismissed as to one at the hearing, and found as to the other two that they were for good cause. The union asks to set the order as to them aside. We have examined the evidence and think it warrants the Board's finding.

We accordingly set aside so much of the order as relates to dominating and interfering with the Federations, disestablishing them and nullifying the collective contracts with them dated August 12 and 18, 1937, as since extended and renewed; but we enforce so much of it as requires Humble to cease and desist from in any manner interfering with, restraining or coercing any of its employees in the exercise of their rights under Section 7 of the Act; and to post the notice thereabout and notify the Regional Director of compliance.