NATIONAL LABOR RELATIONS BOARD
v. MATHIESON ALKALI WORKS,
Inc.

No. 4626.

Circuit Court of Appeals, Fourth Circuit.

Oct. 7, 1940.

Gerhard P. Van Arkel, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Bertram Edises, and Frederick M. Davenport, Jr., Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Wm. A. Stuart, of Abingdon, Va., for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board. The respondent is the Mathieson Alkali Works of Saltville, Virginia, and the order disestablishes an association of its employees as a bargaining agency and directs that respondent cease and desist from interfering with the right of self organization on the part of its employees. The

principal question involved is whether respondent has dominated or interfered with the formation or administration of the association. Respondent contends that the Board's finding to that effect is not supported by substantial evidence; and a careful review of the evidence relied upon by the parties convinces us that this contention must be sustained.

There were approximately 950 employees of respondent, exclusive of supervisory employees, at its Saltville plant; and, following the decision of the National Labor Relations Board cases in the spring of 1937, certain of these employees became interested in forming an organization for the purpose of bargaining collectively with respondent. About the same time, an effort was made to organize a chapter of the United Mine Workers of America in their midst; but there is no evidence that this was begun before the effort to organize the association. Saltville was near communities which had had unfortunate experiences with strikes as a result of activities of the Committee for Industrial Organization; and the knowledge of these experiences, together with knowledge gleaned from newspaper accounts of sit-down strikes which had occurred in other sections of the country, furnished arguments to those who favored organizing an independent association of respondent's employees as an agency for collective bargaining to forestall the organization of an outside union, which it was thought might result in industrial strife and the interruption of employment. Such an association was organized through the efforts of one W. P. Thompson, a mechanic employed by respondent, and certain of his associates, none of whom held a position of supervisory character.

There is no evidence that respondent suggested the formation of the association or assisted in any way in its organization. On the contrary, the evidence is that, when respondent's manager heard rumors that organizational efforts were being talked among the men, he called in twenty-five or more of the thirty-four supervisory employees of higher rank, read the Wagner-Connery Labor Relations Act, 29 U.S.C.A. § 151 et seq., to them and cautioned them to take no part in the matter whatever and to remain strictly neutral as between any rival organizations. This occurred on August 20, 1937. Three days later Thompson and five of his associates called on the manager in his office, informed him that they were forming an association for the purpose of collective bargaining and asked his opinion with regard thereto. The manager stated that he was not permitted under the Wagner Act to advise them what they should or should not do, read to them sec. 7 of the Act, and told them that the choice of an organization rested with the employees. He further stated that for the employer to interfere with employees in the exercise of rights under the Act would constitute an unfair labor practice, and that the only request he had to make of them was not to let any organizational activities that they might decide upon interfere with the performance of their duties during regular working hours.

Prior to this conversation with the manager, many of the men had been reluctant to join the association which Thompson was engaged in organizing, through fear that respondent might be opposed to any organization whatever. After Thompson had received this assurance from the manager as to their rights, however, the signing up of employees for membership in the association proceeded rapidly; and, on September 27th, a meeting was held in the village school at which 100 or more employees were present and at which a committee was appointed to proceed with the work of organization and prepare a constitution and by laws. Another meeting was held on October 5th; and the constitution and by laws which had been prepared were adopted. On October 14th, the organization committee of the association called on the manager and asked that he recognize the association as a bargaining agency, as it had signed up over 700 men of whom 643 had paid their dues. The manager, however, refused at this time to recognize the association as a bargaining agency on the ground that no proper credentials of its authority were presented. On October 19th, the association held an election of members of its council, and on October 20th the council elected officers for the association. On October 22, a negotiating committee of the association held a conference with the management, at which both sides were represented by counsel, and recognition was again requested but was withheld because documentary proof of representation of a majority was not furnished. On October 25th, the committee presented to the management a verified petition for recognition to which was

attached a certified list of 643 paid up members. The association was thereupon recognized as the bargaining agency for the employees and has since functioned in that capacity.

Upon its recognition as a bargaining agent, the association presented eleven requests from the employees relating to wages, hours and conditions of employment; and agreements were reached as to a number of these, including a wage increase of five cents per hour and provision for a five day week of forty hours with time and a half for over time. In the following month, due to a falling off in business, respondent notified the association that it would be necessary to reduce wages, hours of work or the number of employees, and an agreement was reached that the work available be divided or staggered among the employees by allowing four days a week to each employee. The wage scale fixed by the prior agreement was retained. The record shows that the association has had regular monthly meetings of its council and has functioned in a number of matters relating to rights and grievances of the employees. No supervisory employee is a member of the association; and there is no evidence that the respondent has any control over it or any voice in its deliberations, or that respondent contributes in any way to its support or maintenance.

The Board's finding of domination and interference was based upon activities of four foremen of minor supervisory capacity, viz., Terry, Maiden, Holmes and Brown, in advocating the association or soliciting members for it; upon the fact that another foreman, Taylor, was found to have spied upon a union meeting; upon the fact that an assistant superintendent of one of the departments handed to a member of the association's organizing committee an envelope containing a copy of the constitution and by laws of an association in another of respondent's plants; upon the fact that respondent made no attempt to curb solicitation for membership in the association on company property during working hours and permitted an election of association officers to be held on the premises; upon the fact that the records of the association were kept in respondent's vault; and upon the finding that the association had failed to secure any real or lasting benefits for the employees. These matters must be considered in the light of attendant circumstances as disclosed by the record; and, when so considered, they fall far short of showing domination or interference with the association on the part of respondent.

The most serious of the facts to which the Board points is the activities of the foremen. We agree that the mere fact that respondent may have forbidden its supervisory employees to take part in the organizational activities of its employees is not sufficient to purge the association of employer domination, if such domination in fact existed; and we think, also, such domination may be inferred from activities of minor supervisory employees, such as foremen, if their activities were sufficiently wide spread or were of such a character as to form a reasonable basis for the conclusion that they proceeded from the anti-union policy of the employer and interfered with the right of self organization on the part of the employees. Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38, 44.

Sporadic activities on the part of foremen, however, not authorized by the employer and not resulting in interference with or domination of the right of the employees to organize and select bargaining representatives of their own choosing, should not be allowed to nullify a choice freely made by a majority of the employees acting on their own initiative. Humble Oil & Refining Co. v. N. L. R. B., 5 Cir., 113 F.2d 85. It would be absurd, for instance, to hold that, in a contest between the A.F.L. and the C.I.O., the union selected by the majority should be disqualified to act as bargaining representative merely because some foreman, without the authorization or approval of the employer, expressed his preference for or joined in soliciting members for it (National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 341, 342, 59 S.Ct. 508, 83 L.Ed. 682); and this would even more clearly be true if it also appeared that the activities of the foreman had not affected the result of the election. The same principle must be applied with respect to an independent association.

While the extent and effect of activities of foremen and others connected with the management should be carefully scrutinized in such cases, because experience has shown that organization of these independent associations is frequently resorted to by the employer as a means of defeating real collective bargaining, it must

nevertheless be remembered that independent associations, if free of employer domination, are recognized by the law as proper bargaining agencies and are entitled to recognition as such if they represent the free choice of a majority. National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 957; Link-Belt Co. v. N.L.R.B., 7 Cir., 110 F.2d 506, 510; National Labor Relations Board v. Swank Products Co., 3 Cir., 108 F.2d 872, 874.

Applying these principles, we find no support in the record for the finding that the association here was dominated by respondent or that the activities of the foremen interfered with the free expression of the employees or that they resulted in the association's acquiring majority representation. It is significant that of the 150 supervisory employees, only four, and these of the minor character of mere foremen, are alleged to have solicited members or to have encouraged membership in the association. As to these, none except Terry is shown to have secured any applications for membership, and the memberships secured by him were obtained after the meeting of September 27th, when more than a majority of the employees had already signed up. Terry is shown to have solicited 6 or 7 persons for membership, to have collected dues from 25 or 30 and to have had in his possession a petition upon which 70 or 75 had signed their names; but, if the entire 75 be disregarded, the association without them had a clear majority, as 789 employees had signed up for membership and 643 had paid their dues prior to the recognition of the association on October 25th.

Terry was a mere foreman of the crushing machine crew at the quarry, and only about a dozen men worked under him. He attended the September 27th meeting under the impression that he was eligible to membership in the association and was placed on the organization committee, evidently because he was the only man from the quarry at the meeting. Upon learning of his activities, his superior told him that he ought not have anything to do with the association and he desisted from further efforts in its behalf. It is perfectly clear that what he did could not have been any part of a scheme on the part of the management. It would be absurd to think that the manager, who was meticulously avoiding the appearance of evil and was cautioning his supervisory employees to have nothing to do with organizational efforts, would sanction the action of this foreman in participating in the organizational meeting and accepting a place on the organization committee; and it would be unjust to the other employees to deny representation to the association of their free and untrammelled choice merely because of his blundering efforts in their behalf.

Even less importance attaches to the activities of the other three foremen. All that Maiden did was to sign a membership petition with the statement that he did so because of fear of union activity and of being called out on a sympathetic strike. On being informed next day that he was ineligible for membership, he struck his name from the petition. There is no evidence that anyone was influenced by him to join the association, and there is uncontradicted evidence that he told employees working under him that union affiliation would have no effect on their jobs. Holmes allowed a petition for membership to lie on his desk for several days, and three witnesses testified that he asked them to join the association. All of this, however, was after the meeting of October 5th, when the association had already acquired a membership in excess of a majority. Brown is found by the Board to have told certain employees to sign applications for membership in the association; but there is nothing to indicate that anyone was influenced by what he said, and this also occurred after the October 5th meeting. Holmes and Brown denied that they had solicited members for the association or that they had made the statements attributed to them. We must, of course, accept the findings of the Board as to this; but, it is clear from the record that nothing that they did added anything to the association's membership or indicated any control or domination over it by respondent or the supervisory employees of respondent. As was well said by the Circuit Court of Appeals of the Fifth Circuit, speaking through Judge Sibley in the case of Humble Oil & Refining Co. v. N. L. R. B., 5 Cir., 113 F.2d 85, 92: "It would be strange indeed if a labor organization, freely organized by a large majority of the employees, is to be destroyed whenever some well wishing supervisor, contrary to his own duty and orders, says something in its favor. As we see it, the employees who freely formed these organizations have the right under the law to have them function. If

the employer trespasses through his representatives, he and they ought to be stopped, but a more serious and demoralizing trespass than here appears is necessary to show such domination or interference or support as will justify annihilation of such organizations."

See also National Labor Relations Board v. A. S. Abell Co., supra, 4 Cir., 97 F.2d 951, 956, 957; L. Greif & Bro. v. N. L. R. B., 4 Cir., 108 F.2d 551; Ballston Stillwater K. Co. v. N. L. R. B., 2 Cir., 98 F.2d 758, 762; Cupples Co. v. N. L. R. B., 8 Cir. 106 F.2d 100, 115, 116.

The finding that foreman Taylor spied upon a meeting of the C. I. O. union is not supported by the evidence. Taylor denies that he was spying upon the union meeting and the conclusion to the contrary appears to be based on nothing but suspicion. The evidence is that he had stopped his automobile at a filling station opposite the place of meeting and had drunk a bottle of coca cola and purchased some gasoline. Some union members, coming out of the meeting, saw him in the car and testified that he was writing something in a book. They concluded that he was taking down their names. He admits being in the car at the time and place and says that he may have been writing in a memorandum book the mileage of his car, as it was his custom to do this when purchasing gasoline; but he denies that he was taking down names, and there is no evidence to justify the inference that he was doing so. There was, indeed, no occasion for him to be taking down the names of those attending the meeting, as the members of the union made no secret of their membership but openly solicited members in respondent's plant even during working hours. If there had been any desire on the part of respondent or its supervisory employees to spy on the meeting, they would hardly have placed a foreman opposite the meeting hall for this purpose. Certainly they would not have done so while meticulously attempting to preserve the appearance of neutrality and non-interference.

The fact that McCready, an assistant superintendent in one of the departments, handed to Shannon, one of the members of the committee to draw up the constitution and by laws, an envelope containing copy of the constitution and by laws of an association in another of respondent's plants, does not impress us as important. McCready says that he did not know what was in the envelope, and there is no evidence which would justify a contrary inference. The envelope was left on the desk in the "furnace room" office, where he worked, at a place where it was customary to leave mail for employees. Two other persons saw it there before he discovered it; and there is no evidence as to who placed it there. At the meeting of September 27th, the night before, it was remarked that employees who had come from the other plant of respondent had a copy of the constitution and by laws of the association there; and it is entirely possible that some such person left it at the desk for Shannon. If it was placed there by any supervisory employee of respondent, this was certainly done in such way as not to convey to Shannon any information as to its source; and it is not the mere fact that the constitution and by laws come from the employer that is objectionable, but the compulsion on the employees to adopt them when they are suggested by the employer. If the constitution and by laws here came from respondent, they came in such way that no such compulsion was present. There is no evidence, however, that they did come from respondent; and we think it extremely doubtful that they did. An attorney had already been employed to represent the organization committee; and if respondent had desired to get a copy of the constitution and by laws into his hands, it seems highly improbable that it would have resorted to any such crude method as this.

The fact that respondent made no attempt to curb solicitations for association membership on company property would be a damning circumstance, were it not for the fact that respondent's attitude towards the rival union was precisely the same. Ballston Stillwater K. Co. v. N. L. R. B., 2 Cir., 98 F.2d 758, 762. So far as we can see from any evidence called to our attention, the attitude of respondent was that of strict neutrality. Membership in the union, as well as membership in the association, was openly solicited on company property during working hours; and certain of the foremen, as well as certain other employees, seem to have been quite active in the union cause. The Board makes reference to the fact that respondent permitted the association to hold the election for members of its council on company property. At that time, however, the association already had a clear majority

of the employees; and this could not have influenced the obtaining of the majority. The case is entirely different from that presented where an election is held to choose organizations as bargaining representatives and where the fact that it is held on company property may prove an embarrassment to employees in the free expression of their choice. Here those who were conducting the election merely went to persons who were already members of the association and gave them opportunity to cast a secret ballot for members of the council. While it might have been better for the election to have been held at some other place, we cannot see that this circumstance is sufficient, either alone or in connection with other circumstances, to support the conclusion that the association is dominated by respondent.

█ The fact that the records of the association were kept in respondent's vault is utterly without significance when considered, as they must be, in the light of surrounding circumstances. These records were intrusted to Stephenson, the secretary of the association. He was an employee in the accounting department of respondent's office. He had a box in respondent's vault, to which he alone held the key, and in which he kept his private papers. The records of the association were kept by Stephenson in this box and were in respondent's vault only because the box was kept there. They were under the control of Stephenson, not under the control of respondent; and respondent's supervisory officers had no knowledge of how or where they were kept, until the fact was called to their attention by the Board's investigator, when their removal was at once ordered.

█ The Board's finding that the association has failed to secure any real or lasting benefits to the employees has particular reference to the fact that following the wage increase the association agreed to a reduction of hours. There is nothing in the record, however, to justify a finding that the association has not bargained with respondent in good faith, and the Board makes no such finding. In view of business conditions in the latter part of the year 1937, no unfavorable inference can be drawn from the fact that production was curtailed as a result of the recession of business or that a shortening of working hours resulted. To say that a shortening of working hours nullifies a wage increase does not impress us as sound reasoning. An employer who pays the same money for fewer hours work is certainly paying a greater unit price; and the employee who receives the same amount of money for fewer hours of work is unquestionably benefited. It may be that the association has not been as efficient a bargaining agent as an outside union would have been; but that is not the question before us or before the Board. The question is whether the evidence supports the conclusion that respondent dominates the association or was so connected with its organization that it is not a proper bargaining agency for the employees. We do not think that it does. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 341, 342, 59 S.Ct. 508, 83 L.Ed. 682.

█ There is some evidence of sporadic and occasional expressions of antiunion sentiment on the part of a few foremen including one or two in addition to those heretofore mentioned, but, without reviewing this in detail, it is sufficient to say that it furnishes no proof of any unfair attitude on the part of respondent, and was not of a character to justify a cease and desist order on the ground that the expressions were attributable to respondent under the doctrine of respondeat superior. If there were evidence that these foremen were speaking with the authority of respondent, or if their expressions of sentiment were so numerous or of such a character as to justify the inference that they were made with respondent's approval in furtherance of an anti-union policy, an order directing respondent to cease and desist from interfering with its employees in the exercise of the rights guaranteed by sec. 7 of the Act would be proper, even though it should not appear that anyone's affiliation had been changed thereby; for each employee has the right to be let alone in this respect by the employer and his representatives. Humble Oil & Refining Co. v. N. L. R. B., supra. But mere isolated expressions of minor supervisory employees, which appear to be nothing more than the utterance of individual views, not authorized by the employer and not of such a character or made under such circumstances as to justify the conclusion that they are an expression of his policy, will not ordinarily justify a finding against him. As was said in the case of National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474, 479: "Isolated

803

speeches like these made by underlings, though having some authority, in casual conversation with fellow employees, which are not authorized or encouraged or even known to the management, ought not to be too quickly imputed to the employer as his breaches of the law. When not made in the exercise of authority, but in personal conversation, they do not appear to be the sentiments of the employer nor his acts, and to make them such the circumstances ought to show some encouragement or ratification or such repetition as to justify the inference of a policy which they express."

Our decision in National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, is not to the contrary. In that case one of the provisions of a cease and desist order was approved because of the anti-union activities and expressions of the superintendent of the press room of a newspaper. The superintendent was in charge of a branch of the employer's business and his expressions clearly constituted an interference with the right of self organization on the part of the men working under him. To like effect was our decision in Virginia Ferry Corp. v. N. L. R. B., 4 Cir., 101 F.2d 103, where we held the employer responsible, under the respondeat superior doctrine, for the anti-union activities and expressions of the master of a ferry boat. Neither of these cases is authority for holding that the employer is responsible for every chance expression of preference or hostility on the part of minor supervisory employees. In each case the question of the employer's responsibility for expressions of supervisory employees is to be determined by the facts of the case. If the supervisory employee is of such a position as to represent the employer in conducting a branch or department of the business, his expressions and activities with respect to organization would ordinarily constitute effective interference with the exercise of rights by employees and should be attributed to the employer, in application of the respondeat superior doctrine. Even if the supervisory position of

the employee is of minor character, the employer may be held responsible for his conduct if the surrounding circumstances are such as reasonably to justify the inference that it is an expression of the employer's policy or is approved by the employer. National Labor Relations Board v. Swank Products, Inc., 3 Cir., 108 F.2d 872, 875. Where, however, the employee has only minor supervisory authority and the expression of views appears to be nothing more than an expression of ideas of his own, contrary to the neutral policy assumed by the employer, it cannot reasonably support a finding of violation of the Act on the part of the employer. See National Labor Relations Board v. Sands Mfg. Co., supra.

It will be observed that the circumstances upon which the Board relies in support of its findings are disconnected acts and expression on the part of minor supervisory employees, and do not fit into or tend to establish any plan of domination or interference on the part of respondent. Respondent was certainly outwardly assuming a position of neutrality and was forbidding its supervisory employees to interfere with the right of self organization on the part of the workers. It was advised from the beginning by able counsel. If it had sought to engage in secret interference, it certainly would not have resorted to the bungling acts on the part of the foremen which the evidence discloses. Instead of proving interference by the management in the organization of the employees, these acts tend rather to show that the management was keeping hands off; for, instead of being the shrewd interference to which management would resort if secretly interfering while outwardly professing neutrality, they are exactly the sort of thing that such a management would avoid. The circumstances relied on, therefore, do not fit into the only theory of the case which the Board can reasonably put forward.

For the reasons stated, the petition of the Board will be denied.

Petition denied.