**VIRGINIA ELECTRIC & POWER CO. v.
NATIONAL LABOR RELATIONS
BOARD.**

**INDEPENDENT ORGANIZATION OF EM-
PLOYEES OF VIRGINIA ELECTRIC &
POWER CO v. SAME.**

Nos. 4616, 4652.

Circuit Court of Appeals, Fourth Circuit.

Nov. 12, 1940.

George D. Gibson and T. Justin Moore, both of Richmond, Va. (Stephen H. Simes and Hunton, Williams, Anderson, Gay & Moore, all of Richmond, Va., on the brief), for petitioner in No. 4616.

William Earle White, of Petersburg, Va. (Paul E. Hadlick, of Washington, D. C., on the brief), for petitioner in No. 4652.

Lester M. Levin, Regional Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Mortimer B. Wolf and Owsley Vose, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

These are petitions to review and set aside an order of the National Labor Relations Board, which found that the Virginia Electric and Power Company had interfered with, restrained and coerced its employees in the exercise of rights guaranteed by the National Labor Relations Act, 29 U. S.C.A. § 151 et seq., had dominated and interfered with the formation and administration of an employees' association, and had discriminated with respect to hire and tenure of employment in the discharge of certain employees. The order, in addition to the usual cease and desist provisions, directed the disestablishment of the employees' association as a bargaining agency and the reinstatement with back pay of four employees who had been discharged. Petitions to review and set aside the order have been filed both by the company and by the association of employees. The Board has filed answer asking enforcement of the order. Four questions are presented for our consideration: (1) Whether the Board had jurisdiction with respect to the gas and transportation departments of the company's business; (2) whether there was substantial evidence that the company dominated or interfered with the formation or administration of the employees' association; (3) whether the findings as to discriminatory discharge were sustained by substantial evidence; and (4) whether there was evidence of other unfair labor practices which would sustain the cease and desist provision of the order.

## 1. The Question of Jurisdiction.

The company is a public utility engaged in the manufacture, distribution and sale of electrical energy and artificial gas, and in the operation of street railways and local and interurban bus lines. It admits that with respect to its electrical business it is engaged in interstate commerce and is subject to the act, an admission which accords with the decision of the Supreme Court in Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, and the decision of this Court in Appalachian Electric Power Co. v. N. L. R. B., 4 Cir., 93 F.2d 985, 988. The company contends, however, that its gas and transportation businesses are local in character and are without the Board's jurisdiction. A sufficient answer to this position is the unitary character of the Company's business, which has resulted, notwithstanding

the division into these departments, in the organization of a single association of its employees. It is clear that wage controversies or unfair labor practices in any department of such a business will have repercussions in other departments; and strife affecting the interstate commerce in which the company is engaged will be avoided only if the rights of all employees are properly safeguarded. Virginian Railway Co. v. System Federation No. 40, 4 Cir., 84 F.2d 641, affirmed, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Consolidated Edison Co. v. N. L. R. B., supra; National Labor Relations Board v. Planters' Mfg. Co., 4 Cir., 105 F.2d 750. Furthermore, it appears that in the operation of its transportation system the company during 1937 used 31,253,514 kilowatt hours of the electrical power generated in its electrical department and more than two and a half million gallons of gasoline brought from without the state. For operating its gas business that year, it received in interstate commerce more than three million gallons of crude oil, 10,821 tons of coal and 3,800 tons of coke. As we said in the case of the Newport News Shipbuilding & Dry Dock Co. v. N. L. R. B., 101 F.2d 841, 843: "* * * a sufficient ground for regulation appears in the effect of the purchases on interstate commerce, which is within the power and duty of Congress to regulate and protect. If practices in the business will affect such commerce, Congress, under the clearest principles, has the power to regulate them. We have so held with respect to manufacturing products grown within a state for transportation in interstate commerce. Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 94 F.2d 61. The Supreme Court so held with respect to the canning, packing and shipping of agricultural products grown within a state but shipped in interstate commerce, Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954. There can be no difference in principle between the case in which manufacture precedes and that in which it follows interstate commerce. If the flow of commerce is obstructed by labor disputes, it can make no difference from which direction the obstruction is applied."

We accordingly hold that the jurisdiction of the Board extended to the gas and transportation business of the company, as well as to its electrical business.

## 2. The Employees' Association.

The principal question in the case is whether there is substantial evidence to support the finding that the company dominated and interfered with the formation and administration of the employees' association. We do not think that there is. While there is evidence that, prior to the passage of the National Labor Relations Act, the attitude of the company had been opposed to organization of its employees by an outside union, and that its superintendent of transportation in Norfolk had, in 1936, been guilty of the unfair labor practice found by the Board, there is nothing to show that the employees' association does not represent the free choice of the employees, that the company at any time dominated or in any way interfered with the employees in setting it up or that the company exercises over it any control or domination whatsoever. There is evidence, it is true, that a bulletin of the company and an address by its president led to organizational activities on the part of the employees; but neither of these furnishes any basis for a finding of company domination; and the evidence leaves no doubt that the association was formed by the free and untrammeled action of the employees and constitutes a bona fide bargaining agency for them, free of company domination or interference.

In the service of the company there are 2,800 to 3,000 non-supervisory employees. From 1922 to 1937 there was no organization among them and only a scattered few belonged to labor unions. Prior to 1937, the attitude of the company had not been favorable to labor organization; and in 1933 its president had made an address to the employees calling their attention to provisions of the National Industrial Recovery Act 48 Stat. 195, and stating that it was the belief of the company that organization of employees for any purpose was "entirely unnecessary". Early in 1937, however, there was much industrial unrest throughout the country, and the decision of the Supreme Court, upholding the validity of the National Labor Relations Act, led to much discussion among laboring men and in the public press as to the rights and duties of employers and employees under the Act. In this situation, the company, on April 26, 1937, posted on its bulletin boards a statement by its president addressed to its employees as to

its attitude on labor problems.* That statement, after calling attention to the recent decision of the Supreme Court, the industrial unrest and the activities of labor organizations, and after adverting to the satisfactory relationship which had theretofore existed between the company and its employees without labor organizations, went on to say that the company recognized the right of every employee to join any union that he might wish to join, and that such membership would not affect his position with the company. It added, however, that it should be made equally clear that it was not at all necessary for any employee to join any labor organization, despite anything that he might be told to the contrary. It concluded by stating that, if the employees, individually or as a group, had any matter which they wished to discuss with the company, the officers would gladly discuss it with them.

Following the posting of this bulletin, requests for increase of wages and change of working conditions were received from employees in a number of departments, and in at least one department there was attempt at organization with request for a wage increase of 50%. A meeting of the supervisory officials of the company was held to consider this situation; and it was decided that the president should make an address to the employees pointing out their rights under the National Labor Relations Act and the desirability of their choosing agents for the purpose of collective bargaining. The employees were accordingly asked to select from among themselves persons to hear the message of the president, and groups assembled in Richmond and Norfolk on May 24th for that purpose. The address of the president was written out and submitted to legal counsel in advance of its delivery. It was delivered by the president in person to the Richmond meeting of employees, and was read by one of the vice-presidents to the Norfolk meeting. Nothing else of any significance was said by the president or vice president at either meeting, except that at the Richmond meeting the president told the employees that any increase in wages arrived at by collective bargaining would be made effective as of June 1st. The address of the president was as follows:

"A substantial number of its employees representing various departments and various occupations have approached the company with the request that the company consider with them the matter of their working conditions and wages. In other words, they have requested collective bargaining. The company's position with respect to this was recently stated in a posted bulletin.

"In a company such as ours, if an individ-

<hr>

* The Bulletin is as follows:

"To Employees of the Company:

"As a result of recent national labor organization activities and the interpretation of the Wagner Labor Act by the Supreme Court, employees of companies such as ours may be approached in the near future by representatives of one or more such labor organizations to solicit their membership. Such campaigns are now being pressed in various industries and in different parts of the country and strikes and unrest have developed in many localities. For the last fifteen years this company and its employees have enjoyed a happy relationship of mutual confidence and understanding with each other, and during this period there has not been any labor organization among our employees in any department, so far as the management is aware. Under these circumstances, we feel that our employees are entitled to know certain facts and have a statement as to the company's attitude with reference to this matter.

"The company recognizes the right of every employee to join any union that he may wish to join, and such membership will not affect his position with the company. On the other hand, we feel that it should be made equally clear to each employee that it is not at all necessary for him to join any labor organization despite anything he may be told to the contrary. Certainly, there is no law which requires or is intended to compel you to pay dues to, or to join any organization.

"This company has always dealt with its employees in full recognition of the right of every individual employee, or group of employees, to deal directly with the company with respect to matters affecting their interests. If any of you, individually or as a group, at any time, have any matter which you wish to discuss with us, any officer or department head will be glad, as they always have been, to meet with you and discuss them frankly and fully. It is our earnest desire to straighten out in a friendly manner, as we have done in the past, whatever questions you may have in mind. It is reasonable to believe that our interests are mutual and can best be promoted through confidence and cooperation.

"(Signed)  J. G. Holtzclaw, President."

ual operator for example should ask for himself better working conditions or wages, this company could not comply with his request without also making the same concessions to other similar operators. In such a case the operator who appealed individually would, as a practical matter, be bargaining collectively for all of his group, which is not the logical procedure.

"This company is willing to consider the requests mentioned above but feels that in fairness to all of its employees and to itself it should at the same time consider other groups who have not yet come to it. If the approaching negotiations are to be intelligent and fair to all properly concerned, they should be conducted in an orderly way and all interested groups should be represented in these discussions by representatives of their own choosing as provided in the Wagner National Labor Relations Act, which provides as follows: .

" 'Section 7 [§ 157]. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.'

"The Wagner Act applies only to employees whose work is in or directly affects interstate commerce. Counsel for this company advise us that in their opinion the provisions of the Act do not apply to local transportation employees, to gas employees in Norfolk, or to certain strictly local employees of the light and power department. In spite of this, the company wants to make it perfectly clear that its policy is one of willingness to bargain with its employees in any manner satisfactory to the majority of its employees and that no employee will be discriminated against because of any labor affiliations he desires to make.

"The petitions and representations already received indicate a desire on the part of these employees at least to do their own bargaining, and we are taking this means of letting you know our willingness to proceed with such bargaining in an orderly manner. In order to progress, it would seem that the first step necessary to be taken by you is the formation of a bargaining agency and the selection of authorized representatives to conduct this bargaining in such an orderly manner.

"The Wagner Labor Act prohibits a company from 'dominating or interfering with the formation or administration of any labor organization or contributing financial or other support to it.'

"In view of your requests to bargain directly with the company and in view of your right to self-organization as provided in the law, it will facilitate negotiations if you will proceed to set up your organization, select your own officers and supervisors, adopt your own bylaws and rules, and select your representatives to meet with the company officials whenever you desire."

No comment upon or explanation of this address was made, except that at its conclusion the president "explained to the employees that, in plain every-day English, that statement said that they had a right to do whatever they saw fit to do, and their actions must be determined by their own judgment; that neither the company nor any of its officers or executives were to interfere with them in the slightest degree in arriving at a conclusion as to whether they wished collective bargaining with the company, and if so, how they wished to carry out the collective bargaining."

At the conclusion of the meetings, employees asked questions as to what 'sort of organization the company desired the employees to form and were refused any advice by the officials. To a question as to whether they were required to join a labor organization, they were told that they were not. The officers of the company then withdrew from the meetings; and the employees, after some general discussion, adjourned with the understanding that they would report the president's address to the other employees and hold other meetings later to consider the matter of organization. On the next day all supervisory employees throughout the company's business were instructed that they should carefully refrain from offering advice to the men as to their organization or interfering in any way with their efforts to organize.

Following the meetings of May 24th, the men held various meetings in Richmond and Norfolk, at which votes were taken as to whether an independent or affiliated organization was desired for purposes of collective bargaining. Each man was given opportunity to freely express his choice, but only a few favored an affiliated organization, the overwhelming majority favoring an independent bargaining unit. Steering committees were then formed, the services of an attorney of Petersburg, who had

never been employed by the company, were secured, and a constitution and by laws were drawn up, which were submitted to and adopted by the men in meetings held for that purpose. A membership campaign was then conducted, in which more than 90% of the employees enrolled in the association, officers were elected and a general or bargaining committee was set up.

The bargaining committee held a meeting over a week end at a hotel at Ocean View, Va., and drew up a trade agreement, covering wages, labor conditions and hours of work, which was promptly submitted to the officials of the company. A date was, thereupon, set for discussion of the proposed agreement between the committee and the company officials and two days were devoted to its consideration. The result was the signing on August 5th of a trade agreement of the general character contemplated by the National Labor Relations Act. See National Labor Relations Board v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 638. The record leaves no doubt that this agreement was the result of bona fide bargaining at arm's length and that it secured substantial benefits to the employees. Two matters were the subject of much controversy, the amount of the wage increase and the closed shop provision. Both were the subject of compromise. The wage increases demanded by the committee would have increased the annual pay roll by more than $1,000,000. The increases finally agreed upon resulted in an increase of approximately $600,000. The company opposed the provision for the closed shop, but acceded to it on condition that membership in the association should not preclude membership in any other labor organization that the men might desire to join.

The association has continued to function as the bargaining agent of the employees, and its grievance committees have handled many matters with the company. The trade agreement negotiated in 1937 runs from year to year, and negotiations by the company looking toward the elimination of the closed shop provision were in progress in May, 1938, when they were cut short by the institution of these proceedings before the Board.

There is no contention that there is anything objectionable in the constitution or by laws of the association or in the trade agreement arrived at with the company or in the manner in which it was negotiated; and it is not contended that the company contributes any support to the association or dominates it in any way or in any way interferes with the control exercised over it by its members. The Board's finding of domination and interference is based upon the fact that the association came into being as a result of the May 24th meetings and the address of the president, that the president at the meeting spoke of a wage increase to be negotiated by the organization, that the association was organized promptly and within a few weeks after these meetings, that meetings of employees looking to the organization of the association were held on the company's premises, that its bulletin boards were used for posting notices of these meetings and its telephone between Richmond and Norfolk used in connection therewith, and that persons were solicited for membership in the association on the company's premises. We do not think, however, that any of these circumstances, or all of them taken together, when viewed, as they must be, in the light of the surrounding circumstances shown by the record, constitute any substantial evidence of the domination or interference forbidden by the Act. As said by the Supreme Court in Texas & N. O. R. Co. v. Railway Clerks, 281 U.S. 548, 568, 50 S.Ct. 427, 433, 74 L. Ed. 1034: "The intent of Congress is clear with respect to the sort of conduct that is prohibited. 'Interference' with freedom of action and 'coercion' refer to well-understood concepts of the law. The meaning of the word 'influence' in this clause may be gathered from the context. Noscitur a sociis. Virginia v. Tennessee, 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537. The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. 'Influence' in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls 'self-organization.' The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this act than in relation to well-known applications of the law with respect to fraud, duress, and undue influence. * * * Freedom of choice in the selection of representatives on each side of the dispute is the essential foundation of the statutory scheme."

420

We see no evidence of domination or interference in the fact that the company called the employees together and explained to them its desire for collective bargaining and their rights under the National Labor Relations Act. The purpose of the Act is to further collective bargaining as a means of securing industrial peace; and certainly a company, faced with unrest on the part of its employees and demands which can be satisfied only by the collective bargaining which the Act contemplates, is not to be deemed guilty of an unfair labor practice merely because it communicates to the employees its willingness to comply with the law and bargain with them accordingly. It should be noted that, in the address of the president, the right of the employees to select representatives of their own choosing was made abundantly clear, and that the duty of the company and its officers to refrain from interference was properly emphasized; and we see nothing either in the address or in the surrounding circumstances from which the employees could have gained any contrary impression. No hostility towards any outside union was manifested; and, while the Board stresses the concluding paragraph of the address, there is certainly nothing in it, or in any other part of the address, to indicate a desire that the organization to be set up by the employees be not affiliated with an outside organization. On the contrary, the rights of employees were stressed by direct quotation from the labor act and the employees were expressly assured that the company was willing to bargain with them in any manner satisfactory to the majority, that no employee would be discriminated against because of labor affiliations and that the company was prohibited by law from dominating or interfering with the formation or administration of any labor organization or·contributing financial or other support to it. If the company desired an inside, as opposed to an outside union, it did not say so;·and the fact that the employees may have gathered that impression from past dealings with the company cannot supply the element of domination or interference which the Act proscribes. Cf. L. Greif & Bro. v. N. L. R. B., 4 Cir., 108 F.2d 551, 557, 558; Ballston-Stillwater K. Co. v. N. L. R. B., 2 Cir., 98 F.2d 758, 762.

It is suggested by counsel, although not in the Board's decision, that the company transcended proper bounds in suggesting an organization for all its employees instead of dealing with those who had made demands; but we see nothing in this. The Board had made no determination of the proper bargaining unit for the employees; and nothing in the address of the company's president had relation to the bargaining unit. It merely stated that requests relating to working conditions and wages should be considered in the light of the interest of all who would be affected thereby, and that all interested groups should be represented in discussions relating thereto by representatives of their own choosing as provided by law. There is nothing in the address to indicate that the company was unwilling to deal with representatives of different groups, if proper bargaining agencies were provided for them.

And we find no significance in the fact, adverted to by the Board, that the president, at the conclusion of his address at Richmond, stated that any increase in wages resulting from the collective bargaining would date from June 1st. Increase in wages had already been demanded by several groups of employees. Organization for collective bargaining with respect to these increases was contemplated; and assurance that the increases arrived at would date from June 1st meant no more than that employees need not rush hastily into ill-advised organization, but might proceed carefully and deliberately without fear of loss as the result of delay. There was not the trace of a suggestion that any wage increase would be dependent upon the adoption of an inside organization or one favored by the company.

Certainly no significance attaches to the fact that the association was set up as a bargaining agency within a few weeks of the May 24th meetings. It took little time for the employees to call the initial meetings and express their preference as between an inside and an outside, or affiliated, union and to appoint steering committees. This done, it was a small matter for the steering committees, with the aid of an able lawyer, and with the experience of labor organizations throughout the country before them, to draft a satisfactory constitution and by laws for the association and secure their approval and adoption. And, since the men had already voted overwhelmingly in favor of an inside organization, it did not require much time to secure the signing of the membership cards. The fact that a wage increase was in prospect doubtless did expedite the process; but we see nothing sinister in this. If the men had

decided on an affiliated union as bargaining representative, the same cause would have hastened its organization; and we should not lose sight of the fact that throughout the process of organization and agreement, the employees had the advice and assistance of a skilled attorney, who was doubtless able to eliminate much of the lost motion which frequently attends enterprises of this character. There is nothing to suggest that the company, through supervisory employees or otherwise, aided or assisted in any way in the process of organization. There is indeed some evidence that one of the Norfolk superintendents, Bishop, by name, encouraged another organization of employees commenced by one Elliott and his associates, shortly before the May 24th meetings. But this effort came to naught and impeded rather than helped the organization of the association. Nothing in connection with this effort has any tendency to establish domination or interference by the company in connection with the formation or administration of the association.

And, on the facts here, we see no basis for the finding of domination or interference by reason of the meetings of employees or the solicitation of membership on company property, or the use of the company's telephone facilities and bulletin boards. It appears that these meetings were initiated by the employees themselves and that the company had nothing to do with them. Furthermore, they were mere initial meetings, in which the employees were getting together; and no use was made of company property by the association after its organization. No supervisory employee suggested the use of company property even for these initial meetings. The men themselves asked minor supervisory employees that they be allowed to meet in rooms in company buildings, and their requests could hardly have been denied without an appearance of churlish disregard of their convenience. No one seems to have thought that such use would be construed as favoritism or interference, and there is nothing to indicate that the free expression of opinion by the employees or their free choice of a bargaining agency was in anywise affected thereby. While there is some evidence of solicitation of membership for the association on company property, there is evidence also of such solicitation of membership for outside unions. Cf. National Labor Relations Board v. Mathieson Alka-

li Works, 4 Cir., 114 F.2d 796; Ballston-Stillwater K. Co. v. N. L. R. B., 2 Cir., 98 F.2d 758, 762. Such solicitation was contrary to the company's instruction in either case; but among such a large number of employees it was practically impossible to prevent it entirely. The use of the company's telephone in communications between employees in Richmond and Norfolk, was without the knowledge of supervisory employees. So far as bulletin boards are concerned, only one use of the company's bulletin board is shown; and that was in connection with a preliminary meeting held following the president's address of May 24th. After the negotiation of the trade agreement, the association was permitted by its terms to erect its own bulletin boards on company property, which was of course proper. There is nothing in any of these circumstances, or in all of them taken together, sufficient to support a finding that the company was giving aid or assistance to the association, or was interfering in any way with the organization of its employees or their free exercise of choice in the selection of bargaining representatives. It is only as they tend to establish such interference that such circumstances have any significance. In many cases, of course, they are very significant; but when the limited use of company property and facilities here shown is judged in the light of the record, we do not think that it constitutes any substantial evidence upon which a finding of interference or domination could be predicated.

### 3. The Discharges.

The Board found the company guilty of discriminatory discharges of employees Staunton, Elliott, Mann and Harrell. The cases of Staunton and Elliott are ruled by the decision with respect to the association. Their discharges resulted under the closed shop agreement because of their failure to join the association. When the association is sustained as a valid bargaining agency, their discharges must be held proper; for the closed shop provision is expressly provided for by section 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(3).

Mann's discharge is shown to have been due to insubordination and Harrell's to a reduction of the force in which he was employed; and any conclusion that the union affiliation of either had any connection with his discharge is pure speculation, unsupported by anything in the evidence. Mann's

discharge occurred on June 1, 1937, shortly after the May 24th meetings and just after the company's supervisory employees had been expressly cautioned against interference with the organizational efforts of employees. It is hardly probable that he would have been discharged for union affiliation or activity when the company was proceeding so carefully to avoid the appearance of evil. Those responsible for his discharge testify that they did not so much as know that he was a member of a union or had favored that form of organization, and there is no evidence that they did.

Harrell was discharged in March, 1938, when thirteen men were laid off in Norfolk due to a reduction of force in the electrical department. There is no question but that the reduction in force was made bona fide for reasons having no connection with union activity. Harrell was shown to be a hot headed, quarrelsome man who had given considerable trouble; and when the reduction of force became necessary he was selected as one of those to go. We can find no evidence that his union affiliation or activities had anything to do with the matter. He was not prominent in the union and there was no reason for the company to desire to be rid of him because of his union affiliation. It continued to employ other union men high in the councils of the union, and the idea that he was discharged because of union affiliation is nothing more than suspicion. As was well said by Judge Dobie for this court in Martel Mills v. N. L. R. B., 4 Cir., 114 F.2d 624, 633: "Where economic considerations necessitate a contraction in the employer's labor force, the employer, in deciding which employees are to be retained, must be free to choose from the more capable and the more worthy. It would be an abuse of the terminology of the Act if an employer were obliged to discriminate in favor of union men as against non-union men through fear of action by the Board and the courts."

## 4. Unfair Labor Practices.

It is argued that the company was guilty of unfair labor practices, in addition to the domination of the association and the discriminatory discharge of the employees named. The Board, however, found the company guilty of unfair labor practices, in addition to these, only with respect to the questioning of employees by superintendent Bishop in 1936 and the making of statements by one Edwards, a supervisor,

in June, 1937. The Edwards statements may be briefly disposed of. Edwards was of minor supervisory position. Any anti-union expressions of his were contrary to the policy of the company and were clearly nothing more than the utterance of his own individual views. They fall under the rule which we laid down in the case of National Labor Relations Board v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796, 802, as follows: "There is some evidence of sporadic and occasional expressions of anti-union sentiment on the part of a few foremen including one or two in addition to those heretofore mentioned, but, without reviewing this in detail, it is sufficient to say that it furnishes no proof of any unfair attitude on the part of respondent, and was not of a character to justify a cease and desist order on the ground that the expressions were attributable to respondent under the doctrine of respondeat superior. If there were evidence that these foremen were speaking with the authority of respondent, or if their expressions of sentiment were so numerous or of such a character as to justify the inference that they were made with respondent's approval in furtherance of an anti-union policy, an order directing rsepondent to cease and desist from interfering with its employees in the exercise of the rights guaranteed by sec. 7 of the Act would be proper, even though it should not appear that anyone's affiliation had been changed thereby; for each employee has the right to be let alone in this respect by the employer and his representatives. Humble Oil & Refining Co. v. N. L. R. B., supra [5 Cir., 113 F.2d 85]. But mere isolated expressions of minor supervisory employees, which appear to be nothing more than the utterance of individual views, not authorized by the employer and not of such a character or made under such circumstances as to justify the conclusion that they are an expression of his policy, will not ordinarily justify a finding against him."

Superintendent Bishop occupies such a position with the company that unfair labor practices on his part should be attributed to the company on the principle respondeat superior, irrespective of actual authority, and would form a proper basis for a cease and desist order. National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951. The questioning of employees by Bishop in 1936, however, is not a matter of sufficient importance, when standing alone, to justify

the granting of a cease and desist order here, in view of the fact that any effect of such questioning had unquestionably been dissipated by the company's action in 1937 and the formation of the association as a bargaining agency for the employees.

We recognize, of course, that it is for the Board and not us to decide upon the order necessary to remove the effect of an unfair labor practice found to have occurred; but where, as here, the order of the Board is predicated upon other matters, as to which it is reversed, cease and desist provisions, which clearly would not have been made in their absence, ought not be enforced because of an incidental finding as to an unfair labor practice of minor character which, has long since ceased to be operative or to have any effect. A court of equity will not grant an injunction to restrain one from doing "what he is not attempting and does not intend to do". Bleasé v. Safety Transit Co., 4 Cir., 50 F.2d 852, 856.

For the reasons stated, the order of the Board will be reversed and set aside and the motion to enforce will be denied.

Reversed.