NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WIX CORPORATION, Respondent.

No. 8549.

United States Court of Appeals Fourth Circuit.

Argued March 21, 1962.

Decided Nov. 5, 1962.

Paul J. Spielberg, Atty., National Labor Relations Bd. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., National Labor Relations Board, on brief), for petitioner.

J. W. Alexander, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief) for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The National Labor Relations Board has found that Wix Corporation discharged seven of its employees in violation of § 8(a) (3) of the National Labor Relations Act[1] and engaged in other conduct in violation of § 8(a) (1) of the Act. It has filed its petition under § 10(e) for enforcement of its order. Because many of its crucial findings have no support in the record considered as a whole, we grant enforcement only in part.

Wix Corporation is a manufacturer of oil and air filters. It operates a plant at Gastonia, North Carolina, in which there are more than a thousand employees. In the Spring of 1960, the Unit-

---

1. 29 U.S.C.A. § 151 et seq.

ed Automobile Workers launched a quiet campaign to organize the workers. Thereafter, the events occurred which gave rise to these several controversies.

## I. The Discharges

### A. Greene, Buchanan and Almond

These three employees, each of whom had signed a U.A.W. authorization card were separately discharged or laid off following conduct flaunting instructions, rules and plant discipline. The incidents were not immediately related, but these discharges will be considered together because the applicable considerations are related.

Michael Keith Greene was a timekeeper on the third shift. He had a desk on a raised platform in the paper department on the second floor from which he could note any cessation of machine operation in that department. There were also operations which were timed by him on the third floor and in the basement. When an operation on one of the other floors was interrupted, the fact could be communicated to the timekeeper on the second floor over an intercommunications system, and, on such occurrences, the timekeeper had occasion to go to the third floor or to the basement.

Greene kept time for only fifty employees. He admitted that his job did not keep him occupied, and it was because he had so little to do that his job was combined with that of an inspector beginning April 14, 1960. Greene had been told to report on that day for work on the second shift.

Greene had signed a U.A.W. authorization card on the night of April 11th. Two nights later, his last night of work on the third shift preceding his scheduled transfer to the second shift, Greene roamed all over the plant. As the Trial Examiner found, " * * * the record is replete with evidence of Greene's wanderings about the plant * * *." Wilkinson, the third shift supervisor of the Paper Department, relayed to Greene an order from Ellis, the chief production supervisor of all second and third shift operations, to remain at his desk on the second floor except when his work required that he leave it.[2] Greene defied the order and questioned the authority of Wilkinson or Ellis to issue such an instruction. The rest of the night he continued to roam about the plant, doing as he pleased and talking to whomever he wished.[3]

On the evening of April 14th, Greene worked on the second shift, to which he had been transferred by Dellinger, head of the quality control department.[4] When

2. The Board found that Greene was ordered to remain at his desk despite the fact that performance of his job required that he leave it at times. Greene so testified, but the Trial Examiner had found Greene's testimony generally incredible, and that is the decided impression the printed record of his testimony gives. All of the other testimony was that he was instructed to remain at his desk except when his work required him to be away from it, and the Trial Examiner so found.

3. These wanderings and engagements of others in conversations were not just during break periods; they were during work time.

The Board found that he " * * * continued to move about the plant in performing his work. * * *." The implicit finding that Greene did not roam about the plant for his own purposes and without regard to his work is without evi-

dentiary support. Greene admitted that he did. Whether Greene understood Wilkinson's instruction to limit his performance of his duty, he deliberately engaged in extensive conduct, unrelated to his duty, but in plain violation of the instruction and in disregard of its obvious purpose.

4. Greene's time reports went to Dellinger. Dellinger prescribed the records to be kept by the timekeepers and, subject to the approval of the production supervisor concerned, he had the right to transfer them. This led Greene to contend, on the night of the 13th, that Dellinger, who was not ordinarily present in the plant during third shift operations, was his only "bossman" and that Ellis and Wilkinson had no authority to tell him what to do. The Board found that Wilkinson had "no basic authority" over him, which is true only to the limited extent that Wilkinson could not countermand Del-

he reported to work on the evening of the 15th, however, he was told to report to Smith, the personnel manager. Smith told him it was a mistake to have transferred him to the second shift, because the shift foreman objected to him. He should have been laid off when his third shift job was abolished, he was told, and that he was then being laid off for lack of work.

Smith testified that he had received reports of Greene's wanderings about the plant. Greene was suspected of the theft of cigarettes from vending machines in the plant, shortages averaging 8–10 packages a night having been reported and being then under investigation. At the time there was insufficient information to charge Greene with these thefts, but he was one of those whose wanderings would give him an opportunity to visit the machines when other employees were not about.[5] Smith further testified that Greene was a student in a junior college, was attempting to study his lessons while on the job, as Greene admitted, and, in general, was an unsatisfactory employee. He said that Fry, the second shift foreman, objected to Greene and that there was a plant-wide policy against transfers which were unacceptable to the receiving foreman. He further testified that they were in the process of replacing the male timekeepers with women, which appears to have been the fact.

Though Greene had not himself signed a United Automobile Workers authorization card until the night of April 11th, Greene testified that during the remaining three nights of his employment, he was very active in efforts to sign up other employees. He had a number of cloak and dagger stories of incidents in which he was seen, or might have been seen, by supervisors in the act of giving

authorization cards to, or receiving them from, other employees. According to him, this was what he was doing on the night of the 13th when he was roaming about the plant, and he testified that he told Wilkinson that he had been advised by the union organizer that he had a legal right to do what he was doing. He also testified that he was told by Smith that Smith didn't like his attitude about the union, and it was for that reason he was being laid off.

While the Trial Examiner declined to credit Greene's testimony, he, nevertheless, found that Greene was a leader in the organizational movement, that this was known to Wilkinson and to Smith, and that it was the reason for his discharge or layoff.

■ The Board apparently found that because Greene was a leader in the Union's organizational effort, he was told by Wilkinson not to leave his desk under any circumstances, that his job required that he leave his desk, and that he was then discharged because he had not performed his duty, presumably, having been prevented from doing so by Wilkinson's instructions. As indicated, however, the evidence does not support this version of the discharge.

James Buchanan operated a paper pleater machine in the paper department on the third shift. He had long understood that he was not to leave his machine when it was running, which he construed to mean when paper was actually being pleated and not when its gas-fired furnace was in operation. He testified that approximately a week preceding April 18th, he was told by Wilkinson not to leave his machine, except at breaktimes.

On the night of April 18th Buchanan ran some paper through the pleater, using

linger's instructions to Greene about his timekeeping. If the finding is construed to say that Wilkinson had no authority to require that Greene desist from unnecessary and disruptive wandering about the plant, it is without evidentiary support. Even Greene, as a witness, admitted that Wilkinson had such authority.

5. After Greene's layoff, further specific information was obtained indicating that he was the pilferer of the cigarettes. On the witness stand Greene admitted that he had stolen two packages from a vending machine in the plant, but denied that he had stolen more.

the wrong rollers. He then stepped outside the plant to smoke. Wilkinson came by and noticed that the pleated paper had been improperly processed. Wilkinson found Buchanan outside the plant and told him of the mistake that he had made, a mistake which cost the employer approximately $100. Buchanan then returned to his machine and replaced the rollers with proper ones. At about 4:30 o'clock in the morning, however, enough paper had been pleated to serve the assembly line for the remainder of that shift. Buchanan then set up the machine for the next shift, as Wilkinson had instructed him to do, but then he, like Greene, went roaming.

Despite the general instruction he had received to remain at his machine, except at breaktime, Buchanan said he had nothing to do after 4:30 o'clock in the morning of the April 18th third shift operation, and, having nothing to do, he roamed all over the plant. He rode up and down on the elevator to other floors. There was testimony that the elevator was plainly marked with a sign which prohibited its use for such purposes. During these wanderings, Buchanan testified that he attempted to sign up several employees for the United Automobile Workers. Finally, returning to the second floor on the elevator, he was met by Wilkinson, who discharged him for neglect of his work and for leaving his machine in violation of instructions.

Wilkinson testified that Buchanan had been told not only to set up the machine for the next shift, but to clean it with the vacuum cleaner. There was also testimony that the operator of the paper pleater had other duties to perform when paper was not actually being processed. Wilkinson testified that he came by the paper pleater, noticed that it had not been cleaned and went in search of Buchanan, who was not to be seen, this being, of course, the second occasion that night that he had to go in search of Buchanan. When Wilkinson later saw Buchanan disembark from the elevator, he discharged him for leaving his machine and for neglect of his work.

Buchanan testified that during his wanderings on the night of the 18th, he obtained the signature of employee Diddicks to a union authorization card, while the two of them and an employee, Mayberry, were in a restroom. As Diddicks was signing the card, a lead man, Mauney, walked into the restroom. Though Mauney denied that he had observed anyone signing a card, the Trial Examiner found that he had, and inferred that he recognized the card for what it was and reported to Wilkinson that Buchanan was participating in the Union's attempt to organize the employees. The Trial Examiner and the Board thus concluded that the bathroom incident was the reason for Buchanan's discharge later that night. Oddly, the Trial Examiner also drew the inference from the restroom incident that the employer knew of Mayberry's activity in behalf of the Union, for, supposedly, Mauney must have recognized that he was procuring the signature of Diddicks.

■ Hartwell C. Almond was the third wanderer. He was a painter on the third shift. There was testimony of long-standing instructions for the painters to remain in the paintroom, except at breaktime. If the chain carrying cans to be painted broke so that the painting had to be suspended, there was testimony of cleaning and other work which was required of the painters, and they were required to help in the repair of the chain. On the night of April 13th, the same night that Greene was defiantly wandering about in violation of Wilkinson's instructions, the painting-room line was down and the painting work suspended. Almond wandered out of the paintroom and was repeatedly told by Wilkinson and Mauney to remain in the paintroom, except during break periods, and on one occasion that night Wilkinson told Almond that if he and the others did not do as they were told they would be discharged. Almond admitted receiving these orders. About fifteen minutes later, however, Almond was again discovered by Wilkinson outside of the plant, where, according to Almond, he had gone

to smoke,[6] though it was not during a break period. Almond was discharged for violating these instructions.

Though the Trial Examiner found that the instructions limiting the movements of Greene, Buchanan and Almond were motivated by an unlawful purpose to restrict their exercise of protected rights, he found that the instructions to Almond were reasonable, and that Almond deliberately and defiantly disobeyed the reasonable requirement that had been imposed upon him. Because Almond had been specifically warned that discharge would be the consequence of further disobedience, he distinguished Almond's case from those of Greene and Buchanan and concluded that Almond's discharge was justified by his insubordination.

The Board agreed with the Trial Examiner that the instructions were unduly restrictive of Almond's movements and discriminatory in their application, but it disagreed with the Examiner's findings that the instructions to Almond were reasonable. It also disagreed with the Trial Examiner that Almond's final act in violation of the instructions was done in deliberate defiance of them. It concluded that Almond's discharge was unlawful and ordered his reinstatement, as it did Greene's and Buchanan's.

The Trial Examiner and the Board found that the restrictions imposed by Wilkinson upon the movements of these three men were discriminatory and resulted from a purpose to restrict their participation in protected activities and to discourage their organizational efforts. The three, he found, were leaders in the Union's effort to organize the employees, and that fact was known to the employer.

All of the supervisors who testified, with one exception, stated that they knew nothing of the organizational effort until early May. One supervisor did testify that he would "guess" that it was around the middle of April when he first heard of it, from which the Trial Examiner found that the employer knew of the organizational effort in early April, and this despite the fact that there was no evidence of organizational effort in Wilkinson's department until April 11th, and the dischargees testified that they were then doing all they could to keep it secret. At any rate, when Greene and Almond had not so much as signed a card for the Union until the night of April 11th, and when Buchanan had not even signed a card until the night of April 13th, it is difficult to discover the basis of an inference the employer knew and recognized them as the leaders of the Union's effort then or at any earlier date. Buchanan was positive that it was approximately a week before the 18th when he was explicitly instructed to remain at his machine except at breaktimes, but it was not until the 13th that he signed a union card.

■ While each of these employees testified to instructions, which, in their opinion, were departures from earlier instructions, the variations seem of no great significance, or, at least, understandable in the light of the conduct of the employees. Buchanan, for instance, testified that his understanding had been all the while that he was not to leave his machine when it was running. A week before his discharge and before he signed up with the Union, he was instructed that he was not to leave his machine and talk to other employees at their jobs. Pre-

6. The Trial Examiner found that in an unemployment compensation hearing, a Wix supervisor, Loggins, had testified that painters were allowed to leave the paint-room to smoke when the line was down. This finding may have influenced the Board, when, disagreeing with the Trial Examiner's conclusion, it held Almond's discharge unlawful.

In this proceeding, Almond testified that Loggins testified to that effect in the compensation hearing. There was an immediate motion to strike the testimony, which the Trial Examiner granted. This stricken testimony was the only reference to the matter in the hearing. Of course, the Trial Examiner had no right to base a finding upon it or to comment upon the employer's failure to produce Loggins to contradict the excluded testimony.

vention of interference with the work of others while they are busy is a common requirement in industrial plants. There is nothing oppressive about it and there is no basis for a finding that it was discriminatory in the absence of evidence that other employees were allowed freely to interfere with the work of their fellows. There is no evidence of that sort here. Indeed, one would not expect to find such a practice in any industrial plant.

■ If the rule was enforced only as to these three, that fact is of no significance in this case, for these three are the only ones shown to have been roaming widely through the plant during work periods and engaging others in conversation. A rule is not discriminatorily applied when enforced only against those who violate it. These three were guilty of flagrant violations, and no one else was shown to have violated the rule at all. Even if there had been no preceding instructions about it, an employee paid on an hourly basis, as these were, hardly has a right to go roaming off on his own, indulging his own pleasure and engaging in personal conversation and to ignore with impunity a supervisor's instruction to remain in his work area. Whatever the previous understanding, when an employee so far transcends normal practices that his conduct is disorderly or is disruptive of the work of others, there is nothing inherently discriminatory or unlawful in an instruction that he desist. If, thereafter, he persists in his extraordinary conduct in defiance of the instruction, he is plainly insubordinate.

■ It may be, as the Trial Examiner thought in discussing the Almond case, that these employees had been misled into the belief that their endorsement of the Union's organizational effort gave them a license to do as they pleased in the plant and to ignore instructions they did not wish to accept. Their protected rights have no such extent, of course. The instructions they received were entirely reasonable,[7] and, as enforced, cannot be said to have been unwarranted by the unusual conduct of these defiant employees or discriminatory. Whether or not the employer knew of their union adherence, it was not required by the law to submit to their insubordination.

These discharges were for cause, and the Board had no power to require their reinstatement or the payment of back pay to them.[8]

■ We conclude that there is no evidentiary basis in the record for the finding that the discharges of these three men were discriminatory and in violation of § 8(a) (3) of the Act, or for the finding that the employer's efforts to confine them to their work areas during work periods was a violation of § 8(a) (1) of the Act.

---

7. We assume that the instruction to Greene was to remain at his desk except when his work required him to be away, as all of the testimony indicated except that of Greene, which the Trial Examiner did not accept. If the instruction was too restrictive, as Greene testified the fact might have justified his violation of it to the extent that his work required, but it could not justify all of his other admittedly unrelated activity in plain defiance of Wilkinson's order.

8. Section 10(c) of the Act. See National Relations Board v. Local Union No. 1229, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195; Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624; N. L. R. B. v. United Brass Works, Inc., 4 Cir., 287 F. 2d 689; N. L. R. B. v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260; N. L. R. B. v. American Thread Co., 5 Cir., 210 F.2d 381; N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406; N. L. R. B. v. Mylan-Sparta Co., 6 Cir., 166 F.2d 485; N. L. R. B. v. William Davies Co., 7 Cir., 135 F.2d 179; N. L. R. B. v. American Car & Foundry Co., 7 Cir., 161 F.2d 501; N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370; Caterpillar Tractor Co. v. N. L. R. B., 7 Cir., 230 F.2d 357; Miller Electric Manufacturing Co. v. N. L. R. B., 7 Cir., 265 F.2d 225; N. L. R. B. v. John S. Swift Company, 7 Cir., 277 F.2d 641; N. L. R. B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486; Texas Co. v. N. L. R. B., 9 Cir., 198 F.2d 540.

## B.  Mayberry

Brent Mayberry was the stockroom attendant on the third shift.  His work was under the supervision of Rudolph Cannon, who was present in the plant only in the daytime.  Mayberry had been working for Wix only three months.  Cannon had seen him only on two or three occasions, but, when problems arose during the night, Mayberry would telephone Cannon at his home.

On the night of April 18, 1960, Mayberry, in violation of explicit instructions, changed an order for cartons and substituted a different carton.  The result was a packaging error that had to be corrected and a shortage the next day of the cartons that Mayberry had wrongly issued.  When Cannon learned the next day of the occurrence, he telephoned Mayberry, discharged him, and told him the reason for it.

Wix manufactures filters for itself and for certain others who distribute filters under their own brand names.  Walker Air Filters, made by Wix, have different specifications from filters distributed under the Wix name and are packaged in different cartons.  The Walker 6WAF-8 carton is slightly smaller, but of heavier construction than the Wix AF-8A carton.  Walker filters packaged in the Wix AF-8A carton are subject to crushing in shipment, and, since, after packaging, the contents are identifiable only by the carton designation, it could occasion mislabeling and misshipment.  It was on that account that the Wix packages containing Walker filters had to be broken down, the filters repackaged in the proper cartons and the used Wix cartons discarded, for they could not be reopened without damage to them.

On the night of April 18, 1960, there was an order for the Walker 6WAF-8 cartons.  Mayberry testified that in the ready room someone had placed some Wix AF-8 cartons, but these were not of comparable dimension to the Walker 6WAF-8 carton and Mayberry did not undertake to issue them in filling the order.  He procured instead blank Wix AF-8A cartons and changed the order forms to show those cartons rather than Walker 6WAF-7 cartons.

Though there was testimony that Mayberry violated express instructions when he issued the wrong carton and changed the order form, the Trial Examiner sought to excuse his conduct on the basis of the presence of a different Wix carton in the ready room, but Mayberry did not issue those cartons and knew they were unusable.  He also referred to the fact that Mayberry testified that he left a note reciting what he had done for Bill Mauney, lead man in the paper department on the third shift.  What Bill Mauney had to do with it was not made to appear, nor does it appear why Mayberry had to leave a note for a lead man who was working on the same shift at the same time with Mayberry.

As we have noticed in discussing Buchanan's discharge, Buchanan and Mayberry each testified that he persuaded Diddicks to sign a union authorization card while in a restroom on the night of April 18th, and that lead man, Bill Mauney, walked in as Diddicks was signing the card.  Each testified that Diddicks stopped signing the card and attempted to conceal it when Mauney walked in.  Neither testified that Mauney saw it or said anything about it.  Mauney, of course, denied that he observed any such thing.  The Trial Examiner used the restroom incident on the night of April 18th as the basis for an inference that the employer knew that both Buchanan and Mayberry were actively soliciting union memberships.

The inference is very attenuated, particularly as to Mayberry, for Mauney and Mayberry were not in the same department.  No one testified that Mauney saw the cards, Buchanan and Mayberry saying only that he walked in when the card was in Diddicks' hand, and, according to Mayberry, when he had other cards in his hand, all of which Diddicks and Mayberry sought to conceal from Mauney.  This testimony that Mauney might have seen them is the basis of the inference that he did see them, and that he recog-

nized them for what they were. There is then drawn the further inference that Mauney must have recognized that Mayberry was soliciting Diddicks' support and was not himself being solicited by Buchanan or by Diddicks, and, atop all that, there must be the further inference that Mauney reported to someone that Mayberry was actively engaged in union activity, who, in turn, had informed Cannon, the stockroom supervisor, when he came to work sometime after the end of the third shift and Mauney's departure from the plant.

In addition, the finding that Mauney was a supervisor is at least questionable. Mauney was a lead man who worked with other employees, but the record is devoid of any evidence that he had authority to effectively recommend any employer action respecting the employees with whom he worked. Plainly he had no authority with respect to Mayberry.

█ Cannon testified positively that he knew nothing whatever of Mayberry's union sympathy, and that he discharged Mayberry solely because of Mayberry's violation of instructions in changing the order and issuing unspecified cartons on the night of April 18th. Since Mayberry, recently employed, did not deny the wrongful conduct with which he was charged, we think the record, as a whole, does not support a finding that Cannon seized upon Mayberry's admitted fault as a pretense for discharging one whom Cannon knew to be a leader in the Union's organizational effort. His discharge, as those of the persistent wanderers, was for cause.

### C. Carl Hoyle

Hoyle was an inspector in the quality control department under supervisors, Junod and Johnson. He was discharged by Junod on April 18, 1960 for absenteeism.

█ There is no doubt that Hoyle was absent excessively. Though previously he had received written and verbal warnings, he was absent twelve days during the four and a half months preceding his discharge. The circumstances surrounding the final absence were disputed, however, and we conclude that the Board's finding that the absences were not the reason for the discharge has evidentiary support in the record.

Hoyle testified that he had solicited signatures on U.A.W. authorization cards. He said that approximately a week before the 18th, Junod mentioned that union activity, reminded him of his absences and threatened to discharge him and his wife if Hoyle did not "shake up."

Nevertheless, Hoyle was absent on the 13th, because, he said, his wife was ill. He claimed to have sent word by a fellow-employee that he would not be in and said he asked Junod, on the 14th, if he had not received the message when Junod inquired of him if the fish had been biting. He worked on the 14th and for a half day on the 15th. He left, with permission, because his wife was to undergo a minor operation. He did not work on Saturday, the 16th, but he testified he had received permission to be out all day Saturday as well as the half day on Friday.

He was discharged by Junod shortly after he reported for work on Monday, April 18th.

Junod testified that he did not hear until much later of the Union's organizational effort and knew nothing of Hoyle's claimed sympathy or activity. He denied having said anything to Hoyle about a union, but he had repeatedly warned Hoyle about his absences, which created operational problems. He and Johnson denied that Hoyle had been given permission to be out on April 16th.

After an unemployment compensation hearing, Hoyle was penalized seven weeks on the ground that his discharge was for cause—excessive absenteeism. It is plain, however, that if one believes Hoyle and disbelieves Junod and Johnson, he could infer that the excessive absences did not occasion the discharge. However poor his attendance record, discharge on that account would not ordinarily or ought not to follow immediately upon an absence which the employer sanctioned in advance. If, as Hoyle testified,

he obtained on Friday express permission to be absent on Saturday, Saturday's absence should not have provoked the discharge. His testimony of the threat of discharge because of union activity supplies the basis for the Board's inference that Hoyle's union activity was the real reason for the discharge.

## D. Shirley Hoyle

Shirley Hoyle was Carl's wife. She was employed by Wix in February 1960. She reported to her supervisor, Killian, that she was sick on April 11th and that she would be in when she felt better. She entered a hospital on April 14th and a dilation and curettage of the uterus was performed on April 15th. She was dismissed from the hospital on April 18th,[9] but was told to stay at home for a week. On the 20th, she reported by telephone to Killian that she would try to get an appointment with her doctor and would return to work if he released her. She testified she was unable to obtain an appointment with the doctor until April 26th and that he then found she was able to return to work. She telephoned Killian and told him she would report for work that night, but, she said, Killian told her she had been discharged because she had not called in every three days.

Killian testified that Mrs. Hoyle told him on the 20th that she would return to work on the 25th. Several days after the 25th, she had not returned to work and he had heard nothing from her. In a writing, bearing no date, he reported these facts to the personnel office and stated that Mrs. Hoyle should be discharged unless the personnel office had heard from her or unless they learned of other facts affecting the matter. There was testimony of a routine assumption that an employee absent without explanation for forty-eight hours has voluntarily quit. The personnel office classified Mrs. Hoyle's termination on that basis.

If Mrs. Hoyle's testimony is believed, however, if she telephoned Killian on the 26th rather than several days later, the forty-eight-hour rule, or, according to Mrs. Hoyle quoting Killian, the three-day-rule was inapplicable, for the period did not begin to run until the 25th. Since Mrs. Hoyle testified that Killian told her of the rule when she did telephone, Mrs. Hoyle's version is believable only if Killian was applying the rule to absences of employees known to be ill or in the hospital as well as to unexplained absences. However, the Trial Examiner and the Board believed her and disbelieved Killian. Though we may think his version of the facts more reasonable than hers, we cannot say that there is not substantial evidence to support the finding.

Consistent with its position that Mrs. Hoyle quit by failing to report for several days after the 25th, Killian testified that, when she did telephone him he told her to see Smith, the personnel director, and that, as far as he, Killian, was concerned, she could have her job back. Mrs. Hoyle agreed that Killian told her to see Smith and that she did not go to see him. She denied, however, that Killian said anything about a reinstatement.

Mrs. Hoyle testified she had signed a U.A.W. authorization card, but there was no basis for an inference that the employer knew of it. The Board's conclusion is supportable only upon the theory that her discharge was the final step in the execution of the threat to her husband that both would be discharged if he did not desist from his activity. That is the finding of the Board, however, and the finding, drawn out of the highly conflicting testimony, is binding upon us.

## E. Charles E. Ross

The layoff of Ross presents a closer question.

Ross was a timekeeper in the P.C. department on the second shift. His job, as Greene's timekeeping job on the third shift, was not a full one. On Monday, April 18th, it was combined with the job of another timekeeper, Waters, and Ross was laid off for lack of work. There-

---

9. It was that night that her husband was discharged.

after Waters alone performed the combined job until the workload was increased and a woman was added as an additional timekeeper.

There is no doubt that on April 18th there was no need for two timekeepers in the P.C. department on the second shift. There was practical justification for the transfer [10] or layoff of one of the two. The question is whether the decision to lay off Ross rather than Waters was based upon a purpose to rid the plant of a union man.

10. Two weeks earlier, Ross had been offered a job as a lead man, a transfer which would have remedied the problem of the timekeepers. He declined the transfer, though it does not appear that he then knew that the alternative was a layoff of Ross or Waters.

11. The two worked on different shifts, but they were students in a junior college, and they rode together to and from school.

12. Of the three supervisors found by the Board to have observed Ross's union activity and recognized it for what it was, only Kane had anything to do with Ross's work. Kane was the second shift supervisor in the P.C. department. Though Ross worked there, he, like Greene, was in the quality control department under Dellinger and his assistant, McLaughlen, subject to some extent, however, to Kane's direction.

Ross and Greene testified that Greene came into the P.C. department shortly after the start of the third shift on the night of April 11th to get some authorization cards from Ross. As Ross went to get the cards from the pocket of his jacket, Greene walked over to a desk where Kane was attempting to repair an adding machine. Greene was attempting to assist Kane in this endeavor when Ross, returning with the cards, "stuck" them in Greene's pocket. Neither testified that Kane saw the cards. As each described the event, their purpose was obviously to transfer the cards clandestinely. Neither testified to anything which would suggest that their purpose was not accomplished. Kane did not look up from the adding machine at the moment Ross slipped the cards into Greene's pocket. Kane neither said nor did anything to suggest that he had any inkling of what the two were about.

Nevertheless, and despite the fact that Kane testified he saw no cards passed

Ross, one of the two employees first contacted by Crump, the professional organizer, had been active in the Union's organizational effort. It was he who signed up his friend,[11] Keith Greene, on April 11th. With Greene, he was involved in three incidents which, it is said, revealed his union activity to three members of the Wix supervisory staff, Fry, Kane and Wilkinson. The basis of the inference seems tenuous,[12] but we may assume that McLaughlen, who decided to lay off Ross, rather than Waters, knew

between the two, the Board found that he did, and recognized them for what they were. There is no adequate basis for the finding.

Less tenuous, is the inference that Wilkinson saw Ross and Greene exchanging cards on the night of April 14th as the two were leaving the plant and that Wilkinson understood what the two were doing. However, Wilkinson's subsequent warning to Ross to stay away from Greene, because Greene was in trouble seems much more reasonably referable to Greene's insubordinate conduct the night before than to known union activity. Wilkinson denied that he saw anything and testified he had not spoken to Ross, who, of course, was not under his supervision and did not even work on the same shift.

Fry, like Ross and Greene, was a student in the junior college. He rode to school in the same car with them. Ross testified that on the way to school one day, shortly after Crump had contacted him, the three discussed unions. Ross expressed the opinion that a union would be a good thing. Fry disagreed and "believed" that the company would face financial loss if a union came in and could not afford to operate the plant.

This kind of academic discussion among fellow students on the way to school, at a time when there was no apparent effort to organize the employees, does not suggest that Fry, several weeks later, knew that Ross was actively engaged in a union's organizing campaign.

This evidence, collectively viewed in the light most favorable to the Ross claim, might support an inference that the employer, through some of its supervisors, knew that Ross favored the Union and actively supported it. It would not support an inference that Ross was known to be "the leader of the employees' organizing campaign," or that he was "one of the men whose actions were most dis-

of it, despite McLaughlen's disclaimer of knowledge of union activity by Ross and the absence of direct evidence that he knew anything about it.

██ McLaughlen testified that the work of Ross and Waters was substantially equal, but that Waters had outscored Ross on qualification tests which each had taken.[13] He thought Waters had the better potential and decided to keep him and to let Ross go on that basis. In addition, there was testimony of complaints about Ross from a number of production workers. These employees complained that Ross sought to exercise authority he did not possess. This was said to have created friction between Ross and production workers. Kane, the supervisor of the department in which Ross worked, also testified that Ross was quick tempered while Waters was not.

██ Against these reasons for preferring Waters to Ross, it is said only that Waters was the newer employee. The testimony discloses, however, that seniority was considered only when everything else was substantially equal or when there was no other basis for making a selection. There is nothing in the Act which requires an employer, faced with the necessity of laying off one of two employees, to use seniority as its primary criterion or to ignore comparative merit and capability, including capacity to work with others.

There is no contention that Ross was an unsatisfactory employee in the sense that there was cause for his discharge, but there is no showing that, objectively, the employer should have preferred him to Waters. All of the evidence indicates that, if one of them had to go, the employer's preference of Waters was reasonable and warranted. If, therefore, we assume that McLaughlen knew that Ross had been supporting the Union's drive, he was not on that account, required to prefer Ross over Waters. As this court has said:[14]

"* * * Where economic considerations necessitate a contraction in the employer's labor force, the employer, in deciding which employees are to be retained, must be free to choose from the more capable and the more worthy. It would be an abuse of the terminology of the Act if an employer were obliged to discriminate in favor of union men as against nonunion men through fear of action by the Board and the courts. * * *"

██ Here, it does not appear whether or not Waters was a union man. All that appears is that Ross was, but that cannot legitimatize a finding that the

tasteful to it [Wix]." Considered on the basis of the whole record and in light of the fact there were approximately a thousand employees in this plant, it is an insubstantial basis for a finding that McLaughlen knew on April 18th that Ross was active in the organizational effort.

13. Apparently, the Board found that Waters had not taken the test. The Trial Examiner said "Ross testified, however, and without contradiction, that Waters had told him that he had not taken such a test." The statement was literally true, but when Ross so testified, the employer immediately moved to strike it. The motion was granted. Had the Trial Examiner refused the motion, the employer might have offered to contradict the hearsay statement by offering Waters as a witness or producing his written test papers. Since the testimony was stricken, however, the employer could hardly have expected to be allowed to present additional evidence to contradict it.

Accepted as the basis of a finding that Waters had not taken the test, as the Trial Examiner appears to have done, the stricken testimony was thoroughly contradicted by McLaughlen and by other testimony of a routine requirement of these tests. There were other tests for supervisory positions which employees could take upon request. .The Ross-Waters test was requisite.

The stricken testimony, of course, does not support the finding that Waters had not taken the test.

14. Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F.2d 624, 633. See, also, Virginia Elec. & Pow. Co. v. N. L. R. B., 4 Cir., 115 F.2d 414; N. L. R. B. v. William Davies Co., 7 Cir., 135 F.2d 179; N. L. R. B. v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260.

employer should have discriminated against Waters and in favor of Ross.

Since there was a rational, objective basis for the employer's preference of Waters, the layoff of Ross cannot be said to have been unlawful.

## II. Interference, Restraint and Coercion

■ On conflicting evidence, the Board has found that some of the alleged discriminatees were threatened with reprisal for union activity. As to some of them, Hoyle, for instance, if his testimony is accepted and Junod's denial is disbelieved, the finding rests upon substantial evidence. A finding that, sometime after the last of the discharges in issue had occurred, one employee was questioned about union activity of his fellows and requested to report any activity he observed rests upon similar substantial, but not uncontradicted, evidence.

■ These few incidents in a plant employing approximately a thousand employees are a slender support for the Examiner's conclusion, and the Board's, that the employer had an intense antiunion animus and was willing to take extreme and unlawful measures to root out the supposed evil, a conclusion which highly colored the approach to the fact-finding process. The conclusion is all the more dubious because of what the Board completely ignored, a speech by the president of Wix to all of the employees, made at a later date, in which he quite fairly informed them of their rights, the fact that a number of other employees not claimed to be union members were released about the time of the challenged discharges and the fact that a number of union adherents, still employed at Wix, have been subjected to no discrimination.

■ We have found, however, that the efforts to keep Greene, Buchanan and Almond in their work areas during work periods was not a violation of § 8(a) (1) of the Act.

■ Nor was Fry's expression to his fellow school mates of his opinion that economic necessity would cause a closure of the plant if a union represented the employees,[15] a violation of that section. The discussion was academic. It occurred before the organizing campaign was underway and there was nothing to indicate that the statement represented anything other than the personal opinion or speculation of the speaker.[16]

## III. Conclusion

The Board's order, therefore, will be enforced insofar as it requires the employer to desist from threats of reprisal for union activity and from interrogating employees and requesting them to inform on the union activity of their fellows, and to offer reinstatement, with back pay, to Carl Hoyle and Shirley Hoyle. It will not be enforced insofar as it is premised upon the discharges of Greene, Buchanan, Almond, Mayberry or Ross, or upon findings that Wix had imposed discriminatory restrictions upon the movement of employees or threatened to close the plant rather than deal with the Union. The requisite notices to be posted should be modified accordingly.

Enforced in part; enforcement denied in part.

15. See footnote 12, supra.

16. See § 8(c) of the Act.